**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Richard H. KIMMEL,
Defendant-Appellant.**

No. 85–4030.

United States Court of Appeals,
Fifth Circuit.

Nov. 27, 1985.

---

**5.** 105 S.Ct. at 2645 (emphasis supplied).

Hardy Lott, Sam N. Fonda, Greenwood, Miss., and Allan A. Ackerman, Chicago, Ill., for defendant-appellant.

Glen H. Davidson, U.S. Atty., and Thomas W. Dawson, Asst. U.S. Atty., Oxford, Miss., for plaintiff-appellee.

Before CLARK, Chief Judge, BROWN and GEE, Circuit Judges.

GEE, Circuit Judge.

Appellant Richard Kimmel was charged under 18 U.S.C. § 1341 with 23 counts of mail fraud and with obstruction of justice. Tried and found guilty of the mail fraud counts, he asserts on appeal that certain evidence was wrongfully excluded and that several jury instructions were erroneous. We conclude that his trial was conducted properly and therefore affirm his convictions.

In 1976 Kimmel purchased Medart, Inc., a Greenwood, Mississippi manufacturing operation, and contracted with ITT Commercial Finance Corporation to finance his purchase. The contract contained several financing arrangements, one of which involved Medart's accounts receivable. Under this particular arrangement, the amounts of ITT's loans were to be based on a percentage of current accounts receivable as reported by Medart to ITT. Medart was to assign all receivables to ITT in return and was required to forward receipts with each report submitted.

Because he used the United States mail to send these reports, Kimmel fell foul of the federal criminal laws, violating 18 U.S.C. § 1341 between January and April 1980 by sending a series of false reports to ITT. These reports omitted payments totaling over $660,000 that Kimmel had diverted into personal bank accounts. His ruse discovered, this trial eventually followed. Kimmel argued at trial that the diversions were a good faith attempt to keep Medart solvent, but the jury chose to disbelieve his tale and found him guilty on all mail fraud counts. Kimmel's only solace came from a finding of not guilty on the obstruction of justice count involving his alleged attempt to intimidate a witness. He now appeals, advancing various arguments for reversal.

**I.**

Kimmel first complains of the exclusion of certain evidence. In August 1981, ITT executed a written release absolving Kimmel from civil legal liability. Kimmel tried to introduce this release as evidence of his good faith in withholding the funds. The trial court held the release to be irrelevant, however, and refused to allow its admission. Although Kimmel challenges this refusal, we may not second guess the trial judge's evidentiary rulings absent an obvious abuse of discretion. No abuse appears here; rather, the court's decision appears to be fully justified. Kimmel's argument founders because of its inaccurate premise that ITT's release is logically rele-

vant to Kimmel's good faith diversions of the receipts. The release came eighteen months after the diversions and gives not the slightest indication of what went through Kimmel's mind as he mailed the false reports. The exclusion of the release therefore provides no basis for reversal. *Cf. United States v. Welliver,* 601 F.2d 203, 210 (5th Cir.1979), (board of directors' subsequent acquiescence in a bank officer's misappropriation of funds held irrelevant in determining the officer's intent).

## II.

■ Most of Kimmel's arguments focus on particular jury instructions, each of which we must consider to discern whether error occurred. We commence with the trial court's instruction on inferring intent:

As a general rule it is reasonable to infer that a person ordinarily intends the natural and probable consequences of his knowing acts. The jury may draw the inference that the accused intended all the consequences which one standing in like circumstances and possessing his knowledge should reasonably have expected to result from any act of conscious omission and any such inference drawn is entitled to be considered by the jury in determining whether or not the government has proved beyond a reasonable doubt that the defendant did possess the required intent.

Although this court, sitting *en banc,* approved an almost identical instruction in *United States v. Chiantese,* 560 F.2d 1244, 1255–56 (5th Cir.1977), *cert. denied sub nom. Cerrella v. United States,* 441 U.S. 922, 99 S.Ct. 2030, 60 L.Ed.2d 395 (1979), Kimmel nevertheless asks us to forbid its further use.

Admittedly, it bears a faint resemblance to certain instructions which effectually (and unconstitutionally) relieve the government from proving the intent element of a crime. *See Francis v. Franklin,* 471 U.S. ——, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985); *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979); *Chi-*

*antese,* 560 F.2d at 1255. Despite the similar wording, however, an instruction announcing a mandatory presumption differs sharply from one allowing a jury to infer intent. "A permissive inference does not relieve the state of its burden of persuasion because it still requires the state to convince the jury that the suggested conclusion should be inferred based on the predicate facts proven." *Francis,* 471 U.S. at ——, 105 S.Ct. at 1971, 85 L.Ed.2d at 353. This difference is dispositive. The Supreme Court has prohibited instructions mandating an inference of intent because of their likely effect on the jury:

The challenged sentences are cast in the language of a command. They instruct the jury that "acts of a person of sound mind and discretion *are presumed* to be the product of the person's will" and that a person *"is presumed* to intend the natural and probable consequences of his acts".... The jurors "were not told that they had a choice or that they *might* infer that conclusion; they were told only that the law presumed it. It is clear that a reasonable juror could easily have viewed such an instruction as mandatory."

*Francis,* 471 U.S. at ——, 105 S.Ct. at 1972, 85 L.Ed.2d at 354–55, *quoting Sandstrom,* 442 U.S. at 515, 99 S.Ct. at 2454 (emphasis added by the *Francis* Court). No such effect is likely here. Because the trial court never directed the jury to infer Kimmel's intent, we decline the invitation to ignore existing precedent on this kind of instruction. While both the Supreme Court and we have struggled often with inferred intent instructions, that given here is clearly acceptable and we are duty bound to follow the law approving its use.

■ Kimmel next attacks the court's instructions regarding his good faith defense, seen by him as "the key issue," asserting that the trial court "watered down" the instruction by suggesting that the defense does not justify false representations made to ITT.[1] We test the instruc-

---

**1.** Judge Biggers gave the following instructions   on good faith:

tion not against Kimmel's recommended instructions—for he lacks the right to have his recommendations adopted word for word—but against the law. "A district court has substantial latitude in tailoring his instructions as long as they fairly and adequately cover the issues presented by the case." *United States v. Pool,* 660 F.2d 547, 558 (5th Cir.1981). Although we approved an instruction much like this one in *United States v. Wilkinson,* 460 F.2d 725, 729 (5th Cir.1972), we must now examine the totality of the circumstances at trial; detached scrutiny of an instruction's four corners no longer suffices to determine its propriety. *United States v. Gray,* 751 F.2d 733, 735–36 (5th Cir.1985).

In reality, a criminal defendant's good faith defense is the affirmative converse of the government's burden of proving his intent to commit a crime. Because this relationship exists, we must look at all opportunities Kimmel had to rebut the evidence suggesting his intent to defraud. The record shows that Kimmel testified about his motivation and that his counsel argued at length about Kimmel's good faith. The court's charge, taken as a whole, in no way shortchanged Kimmel; to the contrary, Judge Biggers devoted much effort to explaining the government's burden of proving specific intent. In *Gray* we saw no error in the trial judge's refusal to give a good faith instruction because, "[t]aken together, the trial, charge, and closing argument laid Gray's theory squarely before the jury." 751 F.2d at 736. The facts of this trial show that Kimmel had just as great a chance to make his case.

> The court further instructs the jury that good faith is a defense to mail fraud. Therefore, if you believe from the evidence that the submittals containing incorrect information were sent *to ITT for the purpose of enabling Me-*dart to obtain from ITT money which the defendant had reasonable grounds for believing and did believe that Medart was entitled by contract to receive from ITT and were not sent to ITT for the purpose of defrauding ITT, then it would be your duty to find the defendant not guilty of the charges made in counts 1 through 23.

■ We therefore move to Kimmel's next target on appeal, a "consciousness of guilt" instruction. As we noted above, the indictment contained 23 mail fraud counts and one obstruction of justice count for Kimmel's alleged intimidation of a witness. In charging the jury, the court instructed that, should the jury find Kimmel guilty of the obstruction of justice count, it might then view the attempted intimidation as relevant evidence in deciding whether the mail fraud occurred. This was proper; we have recognized the relevance of efforts at witness intimidation in showing the criminal defendant's consciousness of guilt about other crimes charged. *See United States v. Bright,* 630 F.2d 804, 821 (5th Cir.1980). That the jury found Kimmel not guilty of the obstruction of justice count can hardly be said to strengthen his claim of error.

■ Armed with instructions such as these, the jury retired to deliberate at 12:15 P.M. At about 6:00 P.M. on the same day the jury requested the court's guidance:

> If the party, ITT, does not live up to certain parts of the contract, withholding nine hundred thousand dollars credit and cutting money returned to fifty percent, would this relieve Medart of the obligation of sending all receivables to ITT?

The court, however, declined to provide further instruction:

> That is a question of fact, which you must answer from the testimony that you have heard. It is not a question that the court can answer. That is your obligation, your responsibility, and your

> However, a fraudulent misrepresentation or fraudulent representation may be accomplished by conduct, by acts as well as by words, by silence when there is a duty to speak, by half-truths calculated to mislead, or by statements made with a reckless indifference as to whether they are true or false. Thus the defense claim of good faith, while relevant to innocence, would not justify false or reckless representations and promises made by a defendant.

Kimmel asserts that the second paragraph negates the impact of the first, thereby emasculating his good faith defense.

area, not mine, to answer that question. You take that answer from the testimony that you have heard, that has been presented to you.

Kimmel asserts that this refusal constituted an abuse of discretion because it deprived the jury of necessary guidance regarding governing law. Because Kimmel's counsel raised no objection to this exchange, however, only the most exceptional circumstances could warrant a reversal. Well-established law of our circuit confines review of an allegedly defective instruction to which no objection was made to that for plain error, which we have defined as a wrong so obvious and consequential "that our failure to notice it would result in a miscarriage of justice or would seriously affect the integrity or public reputation of the judicial proceeding." *United States v. Cauble*, 706 F.2d 1322, 1343 (5th Cir.1983), *cert. denied*, 465 U.S. 1005, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984). We find no such egregious error here. The trial court's original charge clearly and thoroughly apprised the jury of its responsibilities. This being so, the judge need not have answered the jury's later questions. *See United States v. Middlebrooks*, 431 F.2d 299, 302 (5th Cir.1970), *cert. denied* 400 U.S. 1009, 91 S.Ct. 569, 27 L.Ed.2d 622 (1971); *Eisen-hardt v. United States*, 406 F.2d 449, 451 (5th Cir.1969).

### III.

We turn now to instructions given both in the original charge and on two occasions after the commencement of jury deliberation. This separate consideration is appropriate because a distinct body of law has arisen dealing with instructions urging a deadlocked jury to reach a verdict. Throughout the history of Anglo-American jurisprudence judges have tried to avoid the hung jury.[2] In the mid 19th century, American courts began instructing jurors to reach a verdict even if that required a reexamination of their convictions. The Supreme Court ruled that this instruction was constitutionally permissible in *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). Since then, endless variations on the *Allen* theme have bedeviled courts and commentators struggling to establish guidelines for their use. Long ago, and of necessity, we resigned ourselves to reviewing potentially coercive instructions on a case-by-case basis.

■ The first instruction Kimmel challenges was part of the original charge given at noon.[3] At about four that afternoon the jury notified the court that it was deadlocked. The court recalled the jury and again urged it to reach a verdict.[4] Con-

---

**2.** At early common law, some of their methods were not subtle: one circuit riding judge put jurors into oxcarts and carried them around with him until they had reached a decision. Comment, Deadlocked Juries and Dynamite: A Critical Look at the Allen Charge, 31 U.Chi.L. Rev. 386 (1964), *citing* Crabb, History of English Law 287 (1829). Even in more recent times, American judges have resorted to physical coercion or threats of coercion. *See, e.g., Commonwealth v. Moore*, 398 Pa. 198, 157 A.2d 65 (1959) (jury forced to deliberate all night); *Mead v. City of Richland Center*, 237 Wis. 537, 297 N.W. 419 (1941) (threat of an unheated jury room made in the dead of winter).

**3.** Now, any verdict (sic throughout) that you return must represent the considered judgment of each juror. In order to return a verdict, then, it will be necessary that each juror agree thereto. Before your verdict can be accepted by the Court, all twelve jurors must agree upon that verdict. It is your duty as jurors to consult with one another and to

deliberate and to each agree, if you can do so without violence to your individual judgment. Each of you must decide the case for yourself, but only after impartial consideration of the evidence with your fellow jurors. Do not hesitate to re-examine your own views, do not hesitate to change your opinion if you are convinced that it is erroneous, but do not surrender your honest conviction as to the weight or effect of the evidence solely because of the opinion of your fellow jurors. Remember at all times you not (sic) partisans, you are judges, judges of the facts, and your sole interest is to seek the truth from the evidence in this case.

**4.** I am going to ask that you continue your deliberation in an effort to agree upon a verdict (sic throughout) and dispose of this case. I have a few additional comments I would like for you to consider as you do. This is an important case, the trial has been expensive in time, effort, money, both the defense and the prosecution. If you should fail to agree upon a

sidered separately and in the abstract, the instructions are clearly proper. The original instruction scrupulously follows standard 15–4.4(a) of the American Bar Association's Standards for Criminal Justice (2nd ed. Supp.1982) (hereinafter cited as ABA Standards) and obeys the spirit, if not the precise wording, of the Pattern Criminal Jury Instructions composed by the Federal Judicial Center Committee to Study Jury Instructions (Fed.Judicial Center 1982). Because it was given before the jury retired and "because it makes no reference to a minority but instead charges all jurors to consult with one another," the original instruction lacks harmful coercive effect. ABA Standards, pp. 15.134–35. The midafternoon instruction does not follow these recommended guidelines; we approved its use, however, in *United States v. Bottom*, 638 F.2d 781, 787 & n. 7 (5th Cir.1981), and *United States v. Baker*, 633 F.2d 696, 698–99 & n. 6 (5th Cir.1980). Because the evening instruction simply reiterated that of the afternoon, it provides no new basis for objection. If an error exists, therefore, it must come from the cumulative effect of these instructions.

We are required to consider all circumstances of the case. *See United States v. Fossler*, 597 F.2d 478, 485 (5th Cir.1979). Those of this case evidence no coercive atmosphere sufficient to justify reversal. The trial court's instructions, taken as a whole, do not place undue pressure on the jurors. The above-quoted passages form only a small part of the total body of instructions, a body appearing well balanced and fair. Although he stressed the importance of reaching a verdict, the judge tempered his remarks with reminders that each juror should remain true to his own conscience. Nor were the jurors required to deliberate for an unreasonable length of time.[5] They conferred for seven or eight hours, not an unreasonable postlude to a week-long trial. The court's remarks, moreover, were not threatening in any way. Kimmel's right to an impartial and conscientious jury deliberation was preserved.

### IV.

Kimmel's assertions discussed here provide no occasion for reversal; his others lack sufficient merit to require discussion. The trial court's judgment is therefore

AFFIRMED.

verdit in this case, the case is left open and it must be tried again. Obviously, another trial would only serve to increase the cost to both sides, and there is no reason to believe that the case can be tried again by either side better or more exhaustively than it was tried before you.

And any future jury must be selected in the same manner and from the same source as you were chosen, and there is no reason to believe that the case could even be submitted to 12 men and women more conscientious, more impartial, more competent to decide it or that more clear evidence could be produced to them.

So I am going to suggest that if a substantial number, substantial majority of you are for a conviction, that each descending (sic) juror ought to consider whether a doubt in his or her own mind is a reasonable one, since it appears to make no effective impression upon the minds of other people on the jury.

On the other hand, though, I want to also say that if a lesser number of you are for acquittal, or even if less than a majority of you are for acquittal, then the other jurors ought to seriously ask themselves again whether they do not have a reason to doubt the correctness of a judgment which is not shared by several of their fellow jurors, and whether they do not have a reason to doubt the correctness of a judgment which is not shared by several of their fellow jurors, and whether they should distrust the weight and sufficiency of the evidence which fails to convince several of their fellow jurors beyond a reasonable doubt.

I want you to remember at all times that no juror is expected to yield a conscientious conviction as to the weight or efficiency (sic) of the evidence, but I would like for you also to remember that after a full deliberation and consideration of the evidence in that case, it is your duty to agree upon a verdict in this case, if you can do so without surrendering your conscientious conviction.

5. [T]he real question is whether the jury was required to deliberate an unreasonable length of time or for unreasonable intervals or was threatened with the prospect of such unreasonably lengthy deliberations. ABA Standards, p. 15.135.