**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Arch Emmett GRAHAM,
Defendant–Appellant.**

**No. 88–1159
Summary Calendar.**

United States Court of Appeals,
Fifth Circuit.

Oct. 14, 1988.
Rehearing Denied Nov. 10, 1988.

John D. Nation, Douglas D. Mulder, Dallas, Tex., for defendant-appellant.

Mark H. Marshall, Asst. U.S. Atty. Helen M. Eversberg, U.S. Atty., Austin, Tex., LeRoy Morgan Jahn, Asst. U.S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before POLITZ, KING, and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Defendant Arch Emmett Graham ("Graham") was convicted of one count of distributing cocaine in violation of 21 U.S.C. § 841(a)(1) and one count of conspiracy to distribute cocaine, 21 U.S.C. § 846, and sentenced to five years imprisonment on each count, the sentences to run concurrently. Graham now appeals on several grounds. Finding no error in his trial and that the evidence is sufficient to sustain conviction on both counts, we affirm.

I.

On July 2, 1987, Javier Pena ("Pena"), a special agent with the Drug Enforcement Administration, and Sharon Ross ("Ross"), a police officer, working undercover, met with Brian Williams ("Williams") to arrange the purchase of cocaine. The meeting took place at Jim's Restaurant ("Jim's") in Austin, Texas; Pena, Ross, Williams, and Graham were all present.

At this first meeting, Pena and Williams discussed the purchase of cocaine by Pena from Williams. According to government witnesses, Graham did not participate in the conversation, but was listening intently. After five to nine minutes, Graham got up and left the restaurant. After Graham left, according to Pena, Williams told Pena that Graham was one of Williams's runners.[1] Later, when Pena indicated that he would want to make a second purchase of cocaine after the first transaction was com-

---

1. A runner is a person who transports illegal substances for another.

pleted, Williams stated that Graham would drive the second shipment of cocaine to San Antonio for Williams. Plans for the second purchase were made for Friday, July 10.

Preparations for the first purchase continued. After several aborted attempts at completing the transaction, Pena called Williams on July 8 at 2:00 p.m. Williams told Pena that everything was ready to go, but that Pena should call back later to take care of the final details. When Pena called again, Williams told him that he had sent one of his men on a flight to pick up the cocaine and that the man would arrive back in Austin about 9:00 that evening. Williams and Pena also made arrangements to meet again at Jim's so that Pena could receive a sample of the cocaine.

At that meeting, which took place at 4:15 that same day, Williams stated that he had sent one of his runners by plane to Houston to pick up the cocaine and that it would be in by 9:00 or 9:30. In reference to the second transaction, Williams also asserted that "they" would be able to deliver the second pound of cocaine to Pena in San Antonio on Friday.

Shortly after this conversation, Graham arrived at Jim's in the company of an unidentified woman and sat down with Williams and Pena, who continued to discuss the two drug transactions. During a break in the conversation in which Williams left to make a phone call, Graham told Pena that Graham would drive the second pound of cocaine to San Antonio for Pena, because Graham was very familiar with the San Antonio area.

After Williams returned, Williams and Pena then discussed the first purchase of cocaine to take place that evening, with Pena agreeing to rent a room at a nearby motel to secure a location for completing the transaction. Graham, who Pena testified was listening but not participating in the conversation, acknowledged the meeting at the motel by nodding his head.

At the end of the meeting, Williams gave Pena a sample of cocaine hidden in a package of cigarettes. Again, according to Pena, Graham was present and listening to Williams when Williams told Pena that the package contained cocaine.

At 9:00 p.m., Pena called Williams and told him that he had secured a room at a different motel. Williams acknowledged the change and told Pena that "they" would be at the motel to deliver the cocaine at 10:00 p.m.

Williams and Graham arrived at the room at 10:05 p.m. As Williams entered, he handed Pena a brown paper bag which he had been carrying. As Williams and Graham sat on the bed, Pena removed a bundle from the bag, removed a small amount of white powder later identified to be cocaine, and weighed the remainder of the package. Williams assured Pena that the cocaine was "real good quality, you won't be disappointed." While the package was still on the scales, Pena asked Williams if the substance had come in by airplane, to which Graham replied "No," and, after hesitating, added "but it could have."

Shortly thereafter, while still in the motel room, Williams and Graham were arrested and immediately read their *Miranda* rights. Graham then turned to Pena, and, using Pena's undercover name, said, "Juan, you're my witness, you saw me, I never touched the dope." After repeating this exclamation several times, Williams told Graham to be quiet and that Williams was going to call an attorney.

## II.

Williams and Graham were indicted as co-defendants on one count of conspiracy to distribute cocaine and two counts of distribution of cocaine. On November 17, 1987, the case was called for trial, at which point Williams pleaded guilty to the indictment. After listening to the government's summary of the evidence, Williams told the court that he had never told Pena that Graham was one of his runners or that Graham would drive the second purchase of cocaine to San Antonio.

The case went to trial on the issue of Graham's guilt. Pena testified as to Graham's involvement in the transactions, and specifically noted Williams's statements that Graham was one of his runners and

that Graham would drive the second purchase of cocaine to San Antonio. On cross-examination, Graham's attorney attempted to ask Pena about Williams's denials made the day before, but the trial court sustained the government's objection to the questions and to the introduction into evidence of Williams's statements through Pena.

The jury returned a verdict of guilty on one count of distribution and the conspiracy count, and judgment was entered accordingly. Graham now appeals, alleging (1) that the trial court erred in refusing to allow Graham to impeach Williams's testimony by asking Pena about Williams's inconsistent statements, (2) that the evidence is insufficient to sustain Graham's conviction for either count, and (3) that the trial court instruction to the jury on the issue of intent impermissibly created a mandatory presumption of intent.

### III.

■ Graham's first contention on appeal is that the trial court erred in refusing to allow him to cross-examine Pena on the statements made by Williams while pleading guilty. Because Pena testified as to Williams's statements concerning Graham made during their meetings at Jim's, Graham argues that Williams's subsequent denials of having made the statements are admissible under rule 806 of the Federal Rules of Evidence, which permits the credibility of a hearsay declarant to be impeached with any evidence which would be admissible if the declarant had in fact testified as a witness.[2]

While pleading guilty before the same judge ˙ who conducted Graham's trial, Williams engaged in the following dialogue with the court after the prosecution had summarized the government's evidence against him:

THE COURT: Mr. Williams, do you have any disagreement with the prosecutor's summary of what you did?

DEFENDANT WILLIAMS: Yes, sir. One, I didn't state [Graham] was one of my runners to Pena and—let's see—the delivery to SA, I don't—Arch Graham couldn't never done anything without my word, without my say-so. And it would make no sense for him to be able to say anything like that.

THE COURT: I'm not following that part of it, Mr. Williams.

DEFENDANT WILLIAMS: Okay. It was said that Arch Graham said to [Pena] that he would deliver the second pound, or I had told him that I would have Arch deliver the second pound of cocaine. That's a false statement; I didn't say that at all. As a matter of fact, I denied San Antonio altogether.

Pena was present in court when Williams denied having made the statements. At Graham's trial the next day, Pena testified that during their first meeting, Williams first told him that Graham was one of his runners and later said that he would have Graham drive a pound of cocaine to San Antonio to complete the second transaction.[3] When Graham's counsel tried to cross-examine Pena with Williams's denials of the day before, the government objected, and the trial court sustained its objection.[4]

---

2. Rule 806, in pertinent part, reads as follows:
   When a hearsay statement, or a statement defined in Rule 801(d)(2), (C), (D), or (E), has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness.

3. Williams's statements as to Graham's involvement in the transactions were admitted under rule 801(d)(2)(E), which allows statements of a co-conspirator to be admitted as substantive evidence against a defendant.

4. After reflection, the trial court gave the following reasons for its ruling:
   Rule 806 would allow evidence of a subsequent inconsistent statement that Mr. Williams might have made, and if Mr. Pena were in a position to testify as to such statement, I think it would be admissible, but that is to impeach Mr. Williams, the declarant, according to the rule. What he said was that—or Mr. Pena said that, 'Mr. Williams told me that, "Mr. Graham was one of my runners." ' Mr. Williams in his statement yesterday did not make an inconsistent statement as to that; he said, 'I didn't tell Mr. Pena that Graham was a runner.' And that statement

A trial court's evidentiary ruling will be reversed only if it constitutes an abuse of discretion. *See United States v. Westmoreland*, 841 F.2d 572, 578 (5th Cir.1988). A careful analysis of rule 806 and Williams's two sets of statements reveals that, far from constituting an abuse of its discretion, the trial court's ruling is undoubtedly correct.

The purpose of rule 806 is to establish a standard for attacking the credibility of a hearsay declarant: "The credibility of the *declarant* may be attacked ... by any evidence which would be admissible for those purposes if declarant had testified as a witness." Fed.R.Evid. 806 (emphasis added). The Advisory Committee Notes accompanying the rule explain the underlying rationale for the rule by noting that "[t]he declarant of a hearsay statement which is admitted in evidence is in effect a witness. His credibility should in fairness be subject to impeachment and support as though he had in fact testified." Fed.R.Evid. 806 advisory committee note. Under rule 806, therefore, any prior or subsequent inconsistent statements by *Williams*, the *declarant*, would be admissible to impeach *Williams*'s credibility, just as if Williams himself had testified.

Rule 806, however, requires that a court first decide whether the proffered statement is actually inconsistent with the hearsay statement already admitted. *See United States v. Hale*, 422 U.S. 171, 176, 95 S.Ct. 2133, 2136, 45 L.Ed.2d 99 (1975). In this case, Williams's later statements simply are not inconsistent with "his" hearsay testimony presented through Pena, and thus were properly excluded.

The essence of Williams's hearsay declarations were "Graham was my runner" and "Graham will drive the second shipment of cocaine to San Antonio"; his later statements to the court that "I didn't state [Graham] was one of my runners to Pena" and "I didn't say [that Graham would drive the cocaine to San Antonio] at all" are in no way inconsistent with his earlier declarations. Williams's subsequent statements do not lead one to question whether his earlier statements were untrue, or whether Williams's testimony in the form of his hearsay declarations was unreliable; rather, they go only to the issue of whether Williams actually made any statements, not whether any statements made were true.[5]

As such, the statements would implicate only Pena's credibility, as it was Pena who testified that Williams made the statements at issue. Thus, rule 806, which establishes standards only for the impeachment of Williams, does not authorize introduction of Williams's subsequent hearsay statements impeaching Pena; and no other hearsay exception being applicable, the statements were properly excluded.[6]

The trial court's ruling was properly based upon what Williams actually said while pleading guilty, not upon what Graham thinks Williams meant to say or what Graham wishes he had said. Because Williams's later statements were not inconsistent with his first statements to Pena, the trial court was correct in refusing to admit them under rule 806.

## IV.

Graham's next contention is that the evidence adduced at trial is insufficient to

---

could only be used to impeach Mr. Pena, and is improper impeachment of Mr. Pena, I think. If Mr. Williams had said yesterday, 'Mr. Graham was not my runner,' that's one thing, but that's not what he said.

5. Indeed, the hallmark of an inconsistent statement offered to impeach a witness's testimony is that the statement is not hearsay within the meaning of the term, i.e., it is not offered for the truth of the matter asserted, *see* Fed.R.Evid. 801(c); rather, it is offered only to establish that the witness has said both "x" and "not x" and is therefore unreliable. In this case, the only way Williams's subsequent statement, "I did not tell Pena that Graham was my runner" could affect

the jury's deliberations would be if they accepted the statement as true, and thus refused to believe Pena's testimony. It is thus hearsay in every sense of the term, and was offered to attack not Williams's credibility but Pena's.

6. This does not mean that Graham could not impeach Pena's testimony, but only that he could not do so by using Williams's subsequent hearsay statements. Nothing prevented Graham from calling Williams to testify that he never made the statements at issue to Pena; why Graham did not do so is known only to him and his counsel.

support his conviction on either count. Reviewing the evidence in the light most favorable to the government, *see United States v. Fortna*, 796 F.2d 724, 740 (5th Cir.), *cert. denied*, 479 U.S. 950, 107 S.Ct. 437, 93 L.Ed.2d 386 (1986), we conclude that a reasonable trier of fact could find that the evidence establishes Graham's guilt on both counts beyond a reasonable doubt.

*A. The Distribution Count.*

■ Because Graham did not personally deliver the cocaine to Pena, the government's theory is that Graham aided and abetted the delivery of cocaine. To sustain a charge of aiding and abetting, the government must demonstrate that Graham " 'wilfully associate himself in some way with the criminal venture and wilfully participated in it as he would in something he wished to bring about.' " *United States v. Natel*, 812 F.2d 937, 941 (5th Cir.1987) (quoting *United States v. Tolliver*, 780 F.2d 1177, 1184 (5th Cir.1986), *vacated on other grounds*, 479 U.S. 1074, 107 S.Ct. 1267, 94 L.Ed.2d 128 (1987)).

There is ample evidence from which a reasonable jury could conclude that Graham aided and abetted Williams's distribution of cocaine. Graham was present at both meetings between Williams and Pena, and, government witnesses testified, was listening intently to their negotiations for the purchase of cocaine. Williams identified Graham as one of his runners and stated that Graham would assist in the second transaction by driving the cocaine to San Antonio; Graham himself later told Pena that Graham would do so. Graham

also physically acknowledged the meeting at the motel room to complete the first transaction, and accompanied Williams there at the time when Williams said "they" would deliver the cocaine.[7]

At the motel, Graham watched while Pena extracted a sample of the cocaine from the bundle and weighed the remainder. Graham heard Pena and Williams discuss the quality of the cocaine, and Graham answered Pena's question as to the origins of the cocaine. Finally, after being arrested, Graham evidenced his knowledge of the contents of the package by his exclamation to Pena that he "never touched the dope." [8]

Contrary to Graham's contention that the evidence merely establishes that he was an "informed spectator," the evidence is sufficient for a reasonable factfinder to conclude that Graham, by virtue of his knowledge of every facet of the transaction and his presence at every meeting related thereto, knowingly and intentionally aided and abetted Williams's distribution of cocaine. Hence, we affirm the verdict on the distribution count.

*B. The Conspiracy Count.*

■ To sustain the conspiracy conviction, the government must establish beyond a reasonable doubt that a conspiracy to violate the law existed, that Graham knew of the conspiracy, and that he intentionally joined and participated in it. *See United States v. Prieto–Tejas*, 779 F.2d 1098, 1102 (5th Cir.1986). The jury may infer a conspiracy agreement from circumstantial evidence, *see United States v. Mol-*

---

7. Graham testified that he attended the first meeting for the sole purpose of purchasing some marijuana from Williams, and that he did not hear Williams and Pena discuss the sale of cocaine because he was at the other end of a large booth. As for his attendance at the second meeting, Graham testified that Williams had invited him and his girlfriend to join him for a free meal, and that he did not hear Williams and Pena discuss the sale of cocaine. Graham also denied saying that he would drive the second shipment of cocaine to San Antonio for Pena. In light of the government's substantial evidence to the contrary, we will respect the jury's decision not to credit Graham's testimony.

8. According to Graham's testimony, his incredible streak of being in the wrong place at the wrong time continued when he accompanied Williams to Pena's motel thinking that Williams was in the process of procuring a loan for him. Graham stated that he was unaware that Williams was carrying cocaine until he saw Pena remove a small sample from the package. Again, we find no reason to question the jury's decision as to the credibility of Graham's testimony.

*lier*, 853 F.2d 1169, 1172 (5th Cir.1988), and may rely upon presence and association, along with other evidence, in finding that a conspiracy existed. *See United States v. Magee*, 821 F.2d 234, 239 (5th Cir.1987).

The evidence summarized above, viewed in the light most favorable to the government, is sufficient to establish that Graham was not just present "in a climate of activity that reeks of something foul," *United States v. Wieschenberg*, 604 F.2d 326, 332 (5th Cir.1979); rather, a reasonable jury would have ample reason to find that Graham was an active participant in a conspiracy with Williams to engage in the sale of cocaine to Pena.

## V.

■ Graham's final argument is that the trial court erred in giving the following instruction on the issue of Graham's intent:

It is reasonable to infer that a person ordinarily intends the natural and probable consequences of his or her knowing acts. The jury may draw the inference that the accused intended all the consequences which one standing in like circumstances and possessing like knowledge should reasonably have expected to result from any intentional act or conscious omission. Any such inference drawn is entitled to be considered by the jury in determining whether or not the Government has proved beyond a reasonable doubt that a defendant possessed the required criminal intent.

Graham argues that a reasonable juror could have understood the trial court's instruction as creating a mandatory presumption of intent: Once the government proved the underlying acts giving rise to the inference, intent would be presumed unless Graham proved otherwise. Such an instruction, Graham argues, was declared unconstitutional in *Francis v. Franklin*, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985), because it shifts to the defendant the burden of persuasion on the element of intent, in violation of the defendant's right to due process.

In *Franklin*, the Supreme Court characterized the instruction before the Court as

cast in the language of a command. [It] instruct[s] the jury that 'acts of a person of sound mind and discretion *are presumed* to be the product of the person's will' and that a person '*is presumed* to intend the natural and probable consequences of his acts'.... The jurors 'were not told that they had a choice, or that they *might* infer that conclusion; they were told only that the law presumed it. It is clear that a reasonable juror could easily have viewed such an instruction as mandatory.'

*Id.* at 316, 105 S.Ct. at 1972 (quoting *Sandstrom v. Montana*, 442 U.S. 510, 515, 99 S.Ct. 2450, 2454, 61 L.Ed.2d 39 (1979)) (emphasis added by *Franklin* Court). In contrast, the Court noted that "a *permissive* inference does not relieve the State of its burden of persuasion because it still requires the State to convince the jury that the suggested conclusion should be inferred based on the predicate facts proved." *Id.* at 314, 105 S.Ct. at 1971 (emphasis added).

The instruction given in Graham's trial is clearly phrased in permissive terms. Graham contends, however, that because the trial court did not instruct the jury as to the definition of a permissive inference or how it is to be applied to the facts of the case, it was reasonable for the jury to conclude that the trial court's instruction nonetheless created a mandatory presumption of intent.

Graham's argument is without merit. The instruction itself is a definition of a permissive inference in the context of intent, and the instruction makes it unmistakably clear that any inference drawn is only to be *considered* in deciding whether the government has proved intent beyond a reasonable doubt.

Moreover, we have considered and approved an instruction remarkably similar to that given in Graham's trial. *See United States v. Kimmel*, 777 F.2d 290 (5th Cir. 1985), *cert. denied*, 476 U.S. 1104, 106 S.Ct.

1947, 90 L.Ed.2d 357 (1986).[9] We considered *Franklin* and held that although "the Supreme Court and we have struggled often with inferred intent instructions, that given here is clearly acceptable and we are duty bound to follow the law approving its use." 777 F.2d at 292. The same result obtains here.

The judgment of the trial court is AFFIRMED.

---

9. The instruction considered by the *Kimmel* Court read:

   As a general rule it is reasonable to infer that a person ordinarily intends the natural and probable consequences of his knowing acts. The jury may draw the inference that the accused intended all the consequences which one standing in like circumstances and possessing his knowledge should reasonably have expected to result from any act of [sic] conscious omission and any such inference is entitled to be considered by the jury in determining whether or not the government has proved beyond a reasonable doubt that the defendant did possess the required intent.

   777 F.2d at 292.