**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Mario LECHUGA, Defendant–Appellant.**

No. 88–1717.

United States Court of Appeals, Fifth Circuit.

Nov. 14, 1989.

Rehearing Denied Dec. 28, 1989.

Orr & Davis, Stephen M. Orr, Austin, Tex., for Lechuga.

Helen M. Eversberg, U.S. Atty., James Deatley, Asst. U.S. Atty., Austin, Tex., Philip Police, LeRoy Morgan Jahn, Asst. U.S. Attys., San Antonio, Tex.,

Before THORNBERRY, GARWOOD and SMITH, Circuit Judges.

GARWOOD, Circuit Judge:

Defendant-appellant Mario Lechuga (Lechuga) appeals his conviction, following a jury trial, for one count of conspiracy to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 846, and one count of distribution of cocaine, in violation of 21 U.S.C. § 841(a)(1). Lechuga primarily contests the sufficiency of the evidence to support his conviction on each count. Lechuga also contends that the district court committed reversible error by admitting certain hearsay statements of one of Lechuga's alleged co-conspirators and opinion testimony of one of the government's witnesses. We affirm.

**Facts and Proceedings Below**

On January 5, 1988, Javier Pena (Agent Pena), an undercover special agent with the Drug Enforcement Administration (DEA), met with Isaac Carrasco (Carrasco) at the La Tapatia Restaurant (the Restaurant) in Austin, Texas, in order to discuss a possible cocaine transaction. Carrasco told Agent Pena that he preferred to deal with purchasers of large quantities of cocaine, that his "main man" [1] was out of town at the time, but Carrasco was willing to sell him an ounce of cocaine as a sample for $1,100. They agreed to carry out such a transaction later that day.

At approximately 2:55 p.m. that day, Agent Pena met Carrasco in the Restaurant's parking lot. Agent Pena and Car-rasco entered a red truck, which apparently was owned by Carrasco, where Carrasco sold Agent Pena an ounce of cocaine for $1,100. During that time, Carrasco informed Agent Pena that a man—later identified as Ismael Montenegro (Montenegro)—who was sitting in a brown car parked next to the red truck was helping with the transaction. Saying that he had to retrieve the cocaine from Montenegro, Carrasco walked over to the brown car, and Montenegro gave something to Carrasco, which apparently was the ounce of cocaine that Carrasco subsequently sold to Agent Pena. Agent Pena and Carrasco discussed the possibility of a larger cocaine deal, but Carrasco again said his "main man" was out of town and would not be returning for about five days. As Agent Pena was leaving, Montenegro told him that the cocaine was of high quality.

Two days later, Agent Pena called 477-2355, the telephone number for the Restaurant, and spoke with Carrasco about buying ten more ounces of cocaine. Carrasco said that his "main man" was approximately twenty hours away in Wisconsin, but would be returning in about three days. On the following day, Agent Pena again called Carrasco at the Restaurant. Carrasco informed Agent Pena that Carrasco's people had whatever quantity Agent Pena wished to purchase. On January 15, Agent Pena called Carrasco about purchasing twenty ounces of cocaine, but Carrasco said that his source was having some sort of trouble because of snow on the roads. Later that day, Agent Pena called Carrasco, who said he would have the cocaine on the following day, and they agreed to meet at 11:30 a.m. at the Restaurant to carry out this second cocaine deal.

On the morning of January 16, 1988, Agent Pena called Carrasco. Carrasco said he would have another person, who was going to deliver the cocaine, helping him out with the deal and instructed Agent

---

**1.** Although there was some discrepancy about whether Carrasco actually used the term "main man," Agent Pena did testify that Carrasco used Spanish terms meaning or implying "main man" on a number of occasions. Agent Pena also testified that, in his opinion as a DEA agent for four-and-a-half years and with prior experience in such undercover drug transactions, Carrasco was referring to his source of supply for cocaine when he spoke of his "main man."

Pena to meet them at the Restaurant parking lot about 11:30 a.m. When Agent Pena arrived at the Restaurant at that time, Carrasco informed Agent Pena that the others were running late because, when the "main man" arrived the day before from Wisconsin, they had gone out drinking and were hung over. Carrasco, however, assured Agent Pena that the others would be arriving to deliver the cocaine in twenty or thirty minutes. At trial, Agent Pena testified that, in his opinion, Lechuga appeared to be hung over at the time of his arrest. Finally, Carrasco informed Agent Pena that the price, once again, would be $1,100 per ounce, but the quality would be even better than that sold in the January 5 transaction.

At approximately 11:55 a.m. that day, Agent Pena and the surveillance officers returned to the Restaurant, where the red truck used in the January 5 transaction was parked. Shortly thereafter, Lechuga drove the brown car used in the January 5 transaction into the parking lot, immediately followed by Montenegro in a blue car with a Wisconsin license plate. Montenegro parked the blue car next to the red truck. Lechuga parked the brown car about four or five car lengths away from those two vehicles and remained inside until his arrest. Montenegro left the blue car, walked over to the brown car, and spoke briefly to Lechuga. Montenegro then entered the kitchen area of the Restaurant and called for Carrasco. Carrasco emerged from the kitchen, greeted Agent Pena, and told him that they had the cocaine and that everything was fine. Agent Pena informed Carrasco that he was going to retrieve his money and a set of scales, did so, and returned to the area near the blue car. During that time, Carrasco trot-

ted over to near the brown car, stopped abruptly, and returned to the area near the blue car. At that time, no other people were near the brown car except Lechuga, who remained inside the car. Carrasco and Agent Pena then entered the blue car to consummate the cocaine transaction. While Carrasco was having trouble finding the cocaine, Montenegro left the red truck and walked over to the blue car and was there assured by Carrasco that Agent Pena had the money. Montenegro then retrieved the cocaine from the back seat of the blue car and handed it to Carrasco. Montenegro then returned to the area near the red truck, paused, nodded towards the brown car, and entered the red truck. At trial, Joe Regaldo (Officer Regaldo), an officer of the Austin Police Department for six years and primarily involved with narcotics-related work for three years, who was one of several officers conducting concealed surveillance of the transaction, testified that, in his opinion, this nod indicated to Lechuga that the deal was going well. As Montenegro nodded towards Lechuga, Carrasco tendered the cocaine to Agent Pena to consummate the transaction.

Immediately thereafter, the government agents arrested Lechuga, Carrasco, and Montenegro. They retrieved from Lechuga's person an identification card with Lechuga's name and a Milwaukee, Wisconsin address;[2] a Wisconsin automobile title for the blue car that purported to have been assigned to Lechuga; a scrap of paper with the telephone number 477-2355 followed by "Isaac" and the name of the Restaurant; another scrap of paper with another phone number, 476-5419, matching that found on a scrap retrieved from Montenegro and on a matchbook retrieved from Carrasco; and

---

**2.** More specifically, the card was an "official identification" issued on January 1982 stating that Mario and Teresa Lechuga, 2219 S. 5th Street, Milwaukee, WI 53207, were duly authorized distributors of Shaklee products. The officers also retrieved from Lechuga a scrap of paper with another Wisconsin address—222 S. 17 St., Milwaukee, Wis. 53204.

At trial, Lechuga presented his brother as a defense witness, who testified that Lechuga had been living and working in Wisconsin in 1982

and 1987. He also stated that Lechuga's wife was living with Lechuga in Wisconsin in 1987. He further testified that he worked at the El Galindo tortilla factory in Austin and that he saw Lechuga in Mexico in December 1987 and suggested that Lechuga apply for a job with El Galindo. He did not know whether Lechuga ever did so. It was not until February 1988 that he realized Lechuga had come to Austin. He and Lechuga communicated very little.

a discount card signed by Montenegro.[3]

On June 14, 1988, a jury convicted Lechuga both of cocaine distribution and of conspiracy to do so with respect to the January 16 transaction.[4] The district court subsequently sentenced him to six years' imprisonment on each count, to run concurrently, followed by five years of supervised release. The court also imposed a $4,000 fine and $100 special monetary assessment. This appeal followed.

## Discussion

Lechuga challenges the sufficiency of the evidence supporting his conviction for distribution of cocaine and conspiracy to do so. In evaluating such a challenge, we must examine the evidence and all reasonable inferences that may be drawn from it in the light most favorable to the jury verdict. *See Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Lindell*, 881 F.2d 1313, 1322 (5th Cir.1989). It is the " 'sole province of the jury to weigh the evidence and the credibility of the witnesses.' " *United States v. Martin*, 790 F.2d 1215, 1219 (5th Cir.) (quoting *United States v. Davis*, 752 F.2d 963, 968 (5th Cir.1985)), *cert. denied*, 479 U.S. 868, 107 S.Ct. 231, 93 L.Ed.2d 157 (1986). The evidence is sufficient to sustain the jury's verdict if a rational trier of fact could have found all essential elements of the offense in question beyond a reasonable doubt. *See United States v. Palella*, 846 F.2d 977, 981 (5th Cir.), *cert. denied*, — U.S. —, 109 S.Ct. 162, 102 L.Ed.2d 133 (1988). When making such a determination, " '[i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt.' " *United States v. Henry*, 849 F.2d 1534, 1536 (5th Cir.1988) (quoting *United States v. Bell*, 678 F.2d 547, 549

(5th Cir.1982) (en banc), *aff'd*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983)).

In general, "[w]hat a jury is permitted to infer from the evidence in a particular case is governed by a rule of reason," and juries may properly " 'use their common sense' " in evaluating that evidence. *Id.* at 1537 (quoting *United States v. Cruz–Valdez*, 773 F.2d 1541, 1546 (11th Cir.1985), *cert. denied*, 475 U.S. 1049, 106 S.Ct. 1272, 89 L.Ed.2d 580 (1986)). Moreover, as the United States Supreme Court remarked long ago, "[c]ircumstances altogether inconclusive, if separately considered, may, by their number and joint operation, especially when corroborated by moral coincidences, be sufficient to constitute conclusive proof." *Coggeshall v. United States (The Slavers, Reindeer)*, 69 U.S. (2 Wall.) 383, 17 L.Ed. 911, 914–15 (1865).

■ To establish guilt of conspiracy to distribute cocaine under 21 U.S.C. §§ 841(a)(1), 846, the government must prove beyond a reasonable doubt (1) the existence of an agreement between two or more persons to commit one or more violations of the narcotics laws and (2) the defendant's knowledge of, (3) intention to join, and (4) voluntary participation in the conspiracy. *See United States v. Abadie*, 879 F.2d 1260, 1265 (5th Cir.1989). Unlike many other conspiratorial offenses, section 846 does not require proof of an overt act in furtherance of the conspiracy. *See United States v. Hernandez–Palacios*, 838 F.2d 1346, 1348 (5th Cir.1988); *United States v. Gardea Carrasco*, 830 F.2d 41, 44 (5th Cir.1987). The jury may infer any element of this offense from circumstantial evidence. *See United States v. Graham*, 858 F.2d 986, 991 (5th Cir.1988), *cert. denied*, — U.S. —, 109 S.Ct. 1140, 103 L.Ed.2d 201 (1989). For example, "[a]n agreement may be inferred from 'concert of action,' " "[v]oluntary participation may be inferred from 'a collocation of circum-

---

**3.** At trial, Lechuga's brother testified that Lechuga and Montenegro grew up in the same town in Mexico and, therefore, had known each other for a long time. He did not know if Lechuga knew Carrasco before January 1988. Other than the testimony of Lechuga's brother, there was no defense evidence.

**4.** The jury also convicted Lechuga's co-defendants, Carrasco and Montenegro, on these two counts, as well as a third count for cocaine distribution with respect to the January 5 transaction. The indictment did not charge Lechuga with respect to the January 5 transaction.

stances,'" and "[k]nowledge may be inferred from 'surrounding circumstances.'" *United States v. Espinoza–Seanez*, 862 F.2d 526, 537 (5th Cir.1988). Moreover, although a defendant must have voluntarily participated in the conspiracy to be found guilty, the defendant need play only a minor role in this scheme. *See United States v. Gonzales*, 866 F.2d 781, 788 (5th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 2438, 104 L.Ed.2d 994 (1989).

■ Lechuga essentially contends that he cannot be convicted for mere association with bad characters at the wrong time and place. Although Lechuga's mere presence at the scene of the offense and his apparent association with the other conspirators is alone insufficient to sustain his conspiracy conviction, it is a factor that the jury may properly consider, along with other evidence, in finding him guilty of conspiracy. *See Graham*, 858 F.2d at 992.

■ The government argues that the totality of the following circumstantial evidence linking Lechuga to the January 16 transaction is sufficient to sustain his conspiracy conviction: (1) Lechuga arrived in the brown car, which had been used by Montenegro in the January 5 cocaine transaction, and was immediately followed by Montenegro, who was driving the blue car; (2) before retrieving Carrasco from the Restaurant, Montenegro walked over to the brown car and spoke with Lechuga; (3) Carrasco, for no apparent reason, trotted over to near the brown car before returning to the blue car to sell the cocaine to Agent Pena; (4) as Carrasco closed the deal, Montenegro nodded towards Lechuga; (5) the cocaine was contained in, and its sale was consummated in, the blue car, whose certificate of title was recovered from and purported to have been assigned to Lechuga; (6) a Wisconsin identification card was recovered from Lechuga, the blue car's title certificate and license plates were from Wisconsin, and Carrasco had previously told Agent Pena that his "main man" was coming in from Wisconsin; (7) the phone number that Agent Pena dialed to contact Isaac Carrasco at the Restaurant is identical to that inscribed, along with the name "Isaac," on a scrap of paper recovered from Lechuga; and (8) another particular phone number was inscribed on scraps of paper and a matchbook recovered respectively from all three defendants.

Lechuga counters by emphasizing this Court's decision in *United States v. Espinoza–Seanez*, 862 F.2d 526 (5th Cir.1988). In *Espinoza–Seanez*, Border Patrol agents found 225 pounds of marihuana in the trunk of a car. The driver of that car and his brother, who was supposed to pick up the marihuana from the driver, cooperated with DEA agents to aid the arrest of those to whom the driver's brother was supposed to transfer the marihuana. The driver's brother called his contact and left the car full of marihuana at a restaurant in El Paso, Texas, where the car was to be picked up. Shortly thereafter, the defendant pulled into the restaurant's parking lot, along with two other men in his car, and parked several yards away from the car full of marihuana. An unidentified man jumped out of the defendant's car, drove off with the car in which the marihuana had been left, and eluded the agents who attempted to stop him. The agents arrested the defendant and the other man in his car. The agents found a cellular/mobile phone in the defendant's car. They also found on the defendant's person approximately $1,700, which was roughly the same amount of money as that found on the brother of the original driver of the car full of marihuana. *See id.* at 537. The Court held that, although a reasonable jury could find that the defendant participated in the conspiracy, "no evidence was ever introduced from which a reasonable jury could find that [the defendant] *knew* of the conspiracy." *Id.* at 538 (emphasis in original). Noting that the jury could have concluded that the cellular phone and the $1,700 were "'tools of the trade' for a drug trafficker," the Court emphasized that this was not sufficient to prove the defendant's knowledge beyond a reasonable doubt. *Id. But see id.* at 539 (Sneed, J., dissenting) ("[T]he majority appears to hold that the failure of [the defendant] to drive the car away creates a sufficient possibility that he was an innocent chauffeur of a conspirator

to preclude a finding beyond a reasonable doubt that [the defendant] had the required intent. I cannot agree.").

There are significant differences, however, between the facts in *Espinoza–Seanez* and those in the present case. In *Espinoza–Seanez*, the Court suggested that the evidence showed no more than that the defendant dropped off one of the conspirators where the car with the marihuana was parked. *See id.* at 538. In the present case, the Wisconsin license plate of Lechuga's blue car and the items recovered from his person at the time of arrest suggest that Lechuga was Carrasco's Wisconsin source. Moreover, Lechuga's arrival in the brown car used by Montenegro in the January 5 transaction and his arrival and interaction with Montenegro at the previously agreed time and site of the January 16 transaction also suggest that Lechuga was present to ensure payment for his cocaine. Lechuga's complicity is further suggested by his having the telephone number with Carrasco's first name written by it, and by the fact that he, Carrasco, and Montenegro each also had a written notation bearing another identical telephone number. Finally and perhaps most importantly, the January 16 transaction was consummated in and the cocaine was contained in Lechuga's blue Wisconsin car. A reasonable jury could infer that Lechuga was Carrasco's supplier, closely monitored the transaction to ensure payment for his cocaine, and allowed the other conspirators to consummate the transaction in Lechuga's car where he had stashed the cocaine. We conclude that the evidence is sufficient to support Lechuga's conviction for conspiracy to distribute cocaine.

■ Lechuga also contests his conviction under the substantive count of cocaine distribution. As this Court discussed in *United States v. Gordon*, 876 F.2d 1121 (5th Cir.1989):

"A conviction for distributing cocaine requires proof that the defendant (1) knowingly (2) distributed (3) cocaine. 21 U.S.C. § 841(a)(1); *United States v. McDonald*, 692 F.2d 376, 378 (5th Cir.1982),

*cert. denied*, 460 U.S. 1073, 103 S.Ct. 1531, 75 L.Ed.2d 952 (1983). The Drug Abuse and Prevention and Control Act defines 'distribute' as 'to deliver (other than by administering or dispensing) a controlled substance.' 21 U.S.C. § 802(11). 'Delivery' is defined as the 'actual, *constructive*, or attempted transfer of a controlled substance, whether or not there exists an agency relationship.' 21 U.S.C. § 802(8)." *Id.* at 1125 (emphasis added).

Although Lechuga did not personally tender the cocaine to Agent Pena, and no drugs, drug paraphernalia, money, or weapons were recovered from Lechuga at the time of his arrest, this does not necessarily preclude a distribution conviction. Courts have applied the term "distribute" to a broad scope of conduct. For example, distribution may consist of "acts perpetrated in furtherance of a transfer or sale, such as arranging or supervising the delivery." *United States v. Brunty*, 701 F.2d 1375, 1381 (11th Cir.), *cert. denied*, 464 U.S. 848, 104 S.Ct. 155, 78 L.Ed.2d 143 (1983).

We agree with the government's contention that the jury properly could have found Lechuga liable for the January 16 cocaine distribution offense under the vicarious liability doctrine of *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). An appropriate *Pinkerton* instruction was given to the jury. Under the *Pinkerton* doctrine, even if Lechuga did not personally "distribute" the cocaine in that transaction, he is nevertheless liable for the substantive offense committed by his co-conspirators that was the objective of the conspiracy of which he was a member. *See United States v. Raborn*, 872 F.2d 589, 596 (5th Cir.1989). Lechuga merely contends that such *Pinkerton* attribution cannot follow where the evidence supporting the conspiracy conviction is insufficient. Because we have found the evidence sufficient to support Lechuga's conspiracy conviction, we also find the evidence sufficient to support his distribution conviction under the *Pinkerton* doctrine.

■ Besides contesting the sufficiency of the evidence, Lechuga poses two evidentiary challenges. His principal claim is that the district court erred in admitting, for the purpose of proving the conspiracy and Lechuga's involvement in it, Agent Pena's testimony concerning the statements made by Carrasco in his negotiations with Pena. More specifically, Lechuga apparently challenges the admissibility of Pena's testimony that Carrasco, in the course of arranging the transaction with Pena, told Pena that his cocaine supplier was from Wisconsin and, having just arrived the night before and stayed out late drinking, was hung over on the morning of January 16 and so would be a little late. Lechuga's counsel filed a pretrial motion *in limine* seeking an order prohibiting such testimony from being elicited or admitted against Lechuga. Denying that motion at the close of the government's evidence, the district court ruled that Pena's testimony as to these co-conspirator statements made by Carrasco was admissible.

Rule 801(d)(2)(E) of the Federal Rules of Evidence provides that "[a] statement is not hearsay if ... [t]he statement is offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy."

"In determining [the] applicability [of Rule 801(d)(2)(E)], the district court first must decide that there is enough evidence of a conspiracy involving the declarant and the nonoffering party and that the statement was made 'in the course of and furtherance of the conspir-

acy.' *See Bourjaily v. United States,* [483] U.S. [171], 107 S.Ct. 2775, 2778, 97 L.Ed.2d 144 (1987). If these preliminary facts are disputed, the offering party must prove them by a preponderance of the evidence. *See id.* [107 S.Ct.] at 2779.
" . . . .
"... [In *Bourjaily,*] [t]he Supreme Court allowed the trial court to consider the hearsay statements sought to be admitted along with other evidence when making a preliminary determination as to the conspiracy's existence and the defendant's participation in it. *See [id.]* at 2782.... *Bourjaily* 'abolishes our [*United States v.*] *James* [, 590 F.2d 575 (5th Cir.) (en banc), *cert. denied,* [442 U.S. 917] 99 S.Ct. 2836 [61 L.Ed.2d 283] (1979)] constraints,' to this extent. *United States v. Perez,* 823 F.2d 854, 855 (5th Cir.1987)." *United States v. Ascarrunz,* 838 F.2d 759, 762 (5th Cir.1988).

As discussed above, more than a preponderance of the evidence showed a conspiracy involving Lechuga and Carrasco and accordingly the district court did not err in admitting the evidence of the out-of-court statements by Carrasco under Rule 801(d)(2)(E).[5] Lechuga, however, also contends that the hearsay statements by Carrasco were inadmissible because the government did not prove that these statements were made in furtherance of the conspiracy. In other words, according to Lechuga, these statements were made during idle conversation with Pena and did not further the ultimate consummation of the cocaine transactions.

---

**5.** Lechuga contends that the district court erred in, as Lechuga characterizes it, relying *solely* upon these co-conspirator hearsay statements to determine that a conspiracy involving Lechuga had been established by a preponderance of the evidence. In *Bourjaily,* the Supreme Court refused to reach the issue of whether sole reliance could be placed on the out-of-court co-conspirator statements for this purpose. *See Bourjaily,* 107 S.Ct. at 2781–82. In the present case, it is unnecessary for this Court to address that issue because there was significant evidence, apart from that respecting Carrasco's out-of-court statements, that Lechuga was part of the Montenegro–Carrasco cocaine conspiracy, and it appears that the district court relied on this other evidence independent of Carrasco's statements

in determining the applicability of Rule 801(d)(2)(E). For example, as discussed above, Lechuga arrived at the scene of the January 16 transaction in the brown car used by Montenegro in the January 5 transaction with Carrasco and Pena, was immediately followed into the parking lot by Montenegro who was driving Lechuga's blue out-of-state car, parked near Montenegro, and spoke with Montenegro before Montenegro retrieved Carrasco from the Restaurant. Montenegro later obtained the cocaine from the back seat of Lechuga's car and gave it to Carrasco, who consummated the transaction in that car. Montenegro nodded to Lechuga as Carrasco closed the deal. Finally, the telephone numbers found on the participants also tended to connect them all.

"[T]he phrase 'in furtherance of the conspiracy,'" however, "must not be applied too strictly or the purpose of the exception would be defeated." *Lindell,* 881 F.2d at 1320. "Ordinarily, a statement that identifies the role of one co-conspirator to another is in furtherance of the conspiracy." *United States v. Magee,* 821 F.2d 234, 244 (5th Cir.1987). Although Carrasco did not identify Lechuga by name and, therefore, *Magee* can be factually distinguished from the present case, Carrasco did refer to his Wisconsin source, and a reasonable jury could have inferred from the facts presented that Carrasco was referring to Lechuga. More importantly, these statements clearly were made to explain the delay in carrying out the transaction—*i.e.,* because Carrasco's source was out of town or hung over— and to allay any concerns of the purchaser. Such "[p]uffing, boasts, and other conversation . . . are admissible when used by the declarant to obtain the confidence of one involved in the conspiracy . . . [or] to allay suspicions." *United States v. Miller,* 664 F.2d 94, 98 (5th Cir.1981), *cert. denied,* 459 U.S. 854, 103 S.Ct. 121, 74 L.Ed.2d 106 (1982). Thus, we find that the district court did not err in ruling that these out-of-court statements made by Carrasco to Pena in connection with arranging the cocaine transaction that ultimately took place on January 16 were made in furtherance of the conspiracy.

As a second evidentiary challenge, Lechuga contends that the trial court erred in admitting assertedly "opinion" testimony of Agent Pena. Lechuga's brief, however, fails to specify exactly what testimony by Pena he complains of in this respect.[6] On cross-examination of Pena by Lechuga's counsel with respect to the truthfulness of Carrasco during his drug negotiations, Agent Pena noted, as an example of Car-

rasco's apparent truthfulness, that Lechuga appeared to be hung over. Agent Pena did not explain what symptoms or actions caused him to reach this conclusion. This seems to be the alleged opinion of Pena in dispute, but Lechuga's counsel made no objection to this testimony at trial.

■■■ Where there is no contemporaneous objection to testimony whose admissibility is contested on appeal, the plain error standard of review applies. *Abadie,* 879 F.2d at 1265. "To constitute plain error, the error must have been so fundamental as to have resulted in a miscarriage of justice." *United States v. Yamin,* 868 F.2d 130, 132 (5th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 3258, 106 L.Ed.2d 603 (1989). *See also United States v. Canales,* 744 F.2d 413, 431 (5th Cir.1984). The "plain error" standard implies a more serious and prejudicial error than would otherwise suffice for reversal. *See United States v. Alvarado,* 806 F.2d 566, 573, 575 (5th Cir.1986).

■■■ Rules 701 and 702 of the Federal Rules of Evidence allow certain opinion testimony by expert and lay witnesses. Although it is unlikely that Agent Pena's opinion as to Lechuga's appearing to be hung over would be admissible expert opinion, it is not entirely clear that the district court's admitting such testimony as lay opinion would have constituted error. *Cf.* G. Lilly, *An Introduction to the Law of Evidence* § 4.9, at 108 & n. 8 (2d ed. 1987) (noting that many courts have approved lay opinion as to a person's general physical condition, such as intoxication). Nevertheless, even if such testimony were inadmissible, any error in this connection was harmless in the circumstances of this case and, *a fortiori,* was not plain error. *Alvarado,* 806 F.2d at 575.

---

**6.** Certain statements made by Lechuga's counsel at oral argument suggest a possible complaint as to the admissibility of Officer Regaldo's opinion that Montenegro's nod toward Lechuga indicated that the transaction was going well. Although Lechuga's counsel objected to such testimony in his pretrial motions before the district court, it is doubtful that this matter was preserved by proper objection at trial and highly doubtful that this issue has been raised on ap-

peal (neither of Lechuga's briefs refers to any testimony by Regaldo or any opinion concerning the nod). Moreover, even if it were properly raised and preserved and Officer Regaldo's opinion were inadmissible, the admission of his opinion does not constitute harmful error on the record as a whole. *See* Fed.R.Crim.P. 52(a). We note that a videotape of the "nod" (and other occurrences in the Restaurant parking lot on that occasion) was exhibited to the jury.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.