IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 97-11067
_____

UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

versus

DATARVUS TRAYLOR, MELVIN TRAYLOR,
FREDRICK ROBINSON, also known as Fred,
RODNEY TRAYLOR, and JAMIE PERKINS,

                                        Defendants-Appellants.

_____

Appeals from the United States District Court for
the Northern District of Texas
(3:97-CR-055-T-3)
_____

June 15, 1999

Before REAVLEY, POLITZ and SMITH, Circuit Judges.

REAVLEY, Circuit Judge:[*]

    This case arises from a crack cocaine drug trafficking conspiracy in Greenville, Texas.

Defendants Melvin Traylor, Rodney Traylor, Datarvus Traylor,[1] Fredrick Robinson, and Jamie

Perkins were convicted of various drug trafficking offenses including conspiracy to possess with

the intent to distribute, possession with intent to distribute, and distribution of cocaine base,

commonly known as crack cocaine. Perkins was also convicted of various firearm offenses.

---

[*] Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] Melvin Traylor, Rodney Traylor, and Datarvus Traylor are brothers. Because these appellants share the same last name, we frequently refer to them individually by their first names only and collectively as the Traylors or the Traylor brothers.

Defendants appeal their convictions asserting assorted claims of insufficiency of the evidence and improper jury instructions. Melvin Traylor and Robinson also appeal the district court's application of a two-level weapons enhancement under USSG § 2D1.1 to their sentences. We affirm the convictions and sentences of Melvin Traylor, Datarvus Traylor, Rodney Traylor and Robinson. As for Perkins, we vacate his conviction and sentence on the conspiracy count and otherwise affirm.

## I. PROCEDURAL & FACTUAL BACKGROUND

### A.

Appellants were originally indicted on February 25, 1997, with twenty other defendants in a forty-seven count indictment alleging a wide-spread crack cocaine conspiracy, numerous substantive drug trafficking crimes, and other felony offenses. Before trial, several co-defendants entered into plea bargain or cooperation agreements with the government, agreeing to testify concerning the crack cocaine activity in Greenville. On May 7, 1997, a grand jury returned a twenty-eight count superseding indictment against the appellants and six other defendants. Count one alleged that the appellants were engaged in a wide-spread conspiracy to distribute crack cocaine that began in at least October 1994 and continued until February 1997. The remaining counts alleged numerous substantive drug trafficking and firearm offenses. Appellants pleaded not guilty to all of the charges against them and proceeded to trial. Following a six day jury trial, all of the appellants were convicted of count one of the indictment, conspiracy to distribute cocaine base in violation of 21 U.S.C. §§ 841(a)(1), 846. Rodney Traylor was also convicted of five counts of distribution of cocaine base (counts 9, 10, 13, 18, and 23), in violation of 21 U.S.C. § 841(a)(1). Datarvus Traylor was also convicted of two counts of distribution and one count of possession with intent to distribute crack cocaine (counts 5, 7, and 28). Fred Robinson was also convicted of five counts of distribution and one count of possession with intent to distribute cocaine base (counts 8, 10, 13, 18, 23, and 28). Jamie Perkins was also convicted of two counts of distribution of cocaine base (counts 21 and 24), one count of possession with intent to

2

distribute cocaine base (count 25), two counts of using or carrying a firearm during a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1) (counts 22 and 27), and one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).

The district court applied a two-level weapons enhancement to the base offense level of each of the appellants pursuant to USSG § 2D1.1, based on its finding that Datarvus Traylor possessed a weapon during the conspiracy and that such possession was reasonably foreseeable to each of the appellants. The district court then sentenced each appellant to various terms of imprisonment and supervised release.[2]

B.

The evidence adduced at trial, viewed in the light most favorable to the government, established that Melvin Traylor, Rodney Traylor, Datarvus Traylor, and Robinson were each actively involved in a conspiracy to distribute crack cocaine in Greenville, Texas. The conspirators operated from two principal locations or "stash houses"—a residence at 4108 Park Street and the Heatherton Chase Apartment complex where the Traylors' uncle resided. The evidence also established that Perkins, though not conclusively proven to be a member of the conspiracy, was also a mid-level crack cocaine dealer in Greenville. In the Fall of 1996, state and federal law enforcement officers initiated an investigation into the distribution of crack cocaine in Greenville. They used confidential informants and undercover officers to make numerous purchases of crack cocaine from the appellants and others. The investigation team utilized

---

[2] Melvin Traylor was sentenced to 275 months of imprisonment on count one. Rodney Traylor received concurrent 216-month terms of imprisonment on count one and counts nine, ten, thirteen, eighteen, and twenty-three. Datarvus Traylor received concurrent 216-month terms of imprisonment on count one and counts five, seven, and twenty-eight. Fredrick Robinson was sentenced to concurrent imprisonment terms of 324 months on count one and 240 months on counts eight, ten, thirteen, eighteen, twenty-three, and twenty-eight. Jamie Perkins was sentenced to a total of 528 months imprisonment, which consisted of concurrent terms of 120 months on count twenty-six and 168 months on counts one, twenty-one, twenty-four, and twenty-five, and consecutive terms of 120 months on count twenty-two and 240 months on count twenty-seven. The court also imposed various terms of supervised release and mandatory special assessments on each of the appellants.

3

electronic surveillance equipment and captured several drug negotiations and transactions on audio or videotape. The government's case against the appellants was supported by (1) the testimony of confidential informants, cooperating co-conspirators, undercover law enforcement officers, DEA agents, and DEA chemists; (2) the physical evidence recovered during the investigation, including crack cocaine, drug paraphernalia, cash, and weapons; (3) the audio and video tapes and corresponding transcripts of certain drug negotiations and transactions; (4) the DEA chemists' reports; and (5) other corroborating evidence.[3]

Confidential informant William Eric Olive was a key witness for the prosecution. Olive began working with DEA agents in the Greenville investigation in November 1996 and received cash compensation for his work. Olive successfully infiltrated the Greenville drug conspiracy by purporting to be a crack dealer from Arkansas in search of cheaper prices. He frequently wore a body wire during undercover drug transactions and recorded certain drug-related telephone conversations. Olive testified to several transactions involving the Traylor brothers and Robinson. On September 18, 1996, Olive was working with undercover police officer Vern Wilson. While driving around Greenville, in search of crack cocaine, the two men picked up an unknown male[4] who directed them to the Heatherton Chase Apartments. While at the apartment complex, the unknown male spotted Datarvus Traylor; he then exited the undercover vehicle and went to speak with Datarvus about making a purchase. The unknown male returned to the car and told Olive and Wilson that they needed to wait a few minutes while Datarvus went to get the drugs. When Datarvus returned, Officer Wilson and the unknown male approached Datarvus's vehicle at the driver's side window. Officer Wilson told Datarvus he wanted to buy a $50 piece of crack cocaine. Datarvus had a plastic bag containing a substance the size of a golf ball, which Wilson

---

[3] At trial, the government presented substantial evidence of the drug trafficking activity of these appellants. We, however, summarize only the transactions, testimony, and other evidence relevant to this appeal.

[4] Olive had previously met this individual during his undercover dealings in Greenville, but could not recall his name at trial.

estimated to be approximately half an ounce of crack cocaine. Datarvus sliced off a small piece, 0.9 grams, and gave it to Wilson in exchange for the cash. Four days after the transaction, Wilson identified Datarvus Traylor as the seller from his driver's license photograph. At trial, Wilson again affirmatively identified Datarvus.

On November 13, 1996, Olive met with Michael Bowen, an indicted co-conspirator, and told Bowen he was looking for some "yeah," which is slang for crack cocaine. After first picking up Bowen's baby, the two men drove to 4108 Park Street, one of the "stash houses" frequently used by the conspirators. Olive gave Bowen $500 and remained in the car with Bowen's baby while Bowen went inside to make the deal. Although Olive did not personally witness the hand-to-hand transaction between Bowen and Datarvus, Bowen returned to the car with 20.4 grams of crack cocaine and recounted to Olive his drug transaction with Datarvus inside the house.

Several other undercover purchases occurred in late 1996 and early 1997, including the following. On November 15, 1996, Olive went to 4108 Park Street and purchased 29.6 grams of crack cocaine from Fred Robinson. On November 20, Olive and Johnny Morris drove to 4108 Park Street with the intention of buying an ounce of crack cocaine. Olive gave Morris the cash and waited outside while Morris went inside the house and made the deal. Morris returned to the car, gave Olive 30.2 grams of crack cocaine, and stated that he purchased the drugs from Rodney. Undercover police officer Steve Underwood also made a purchase on November 20 from Rodney, Robinson, and co-defendant Chandra Pye. Underwood contacted Pye and inquired about buying some crack cocaine. Pye paged Rodney to arrange the purchase. Underwood and Pye then drove to the Heatherton Chase apartment complex and waited until Rodney and Robinson arrived with the drugs. Underwood gave Pye $200 and waited outside while the other three went into apartment 11-A and made the exchange. Pye returned to Underwood's truck and delivered 3.6 grams of crack cocaine.

On December 4, Olive met Rodney and Robinson at 4108 Park Street and made arrangements to purchase in excess of one kilogram of crack cocaine the following day. On

December 5, Olive again met Rodney and Robinson at a local carwash to make the deal and ultimately purchased 93.4 grams of crack cocaine. During the transactions, Rodney gave Olive his pager number and suggested setting up a regular purchasing schedule.

On December 18, Olive telephoned Rodney to purchase some more cocaine. Equipped with a body wire, Olive then met Rodney and Robinson at 4108 Park Street and the three men drove to the Heatherton Chase Apartment complex and entered apartment 11-A, the home of Rodney's uncle and the conspirators' new "stash house." After some time, Melvin Traylor pulled into the parking lot driving a white truck. Robinson saw Melvin pull up and whispered to Rodney, "there goes Melvin." According to Olive's testimony, Rodney replied, "yeah, yeah, there goes my boy. Yeah, Yeah, now I can hook you up." The three men left the apartment and walked out to the parking area. Rodney went over and spoke with Melvin while Olive and Robinson stood off to the side. The four men then left the apartment complex in separate vehicles. Robinson and Rodney drove to 4108 Park Street, while Olive drove to the carwash around the corner and waited until Robinson arrived a few minutes later with the drugs. After further negotiations, Olive purchased a large quantity of drugs (110.4 grams) for $3,200. Olive conceded on cross-examination that Rodney's statement after Melvin arrived at the apartment complex—"there goes my boy . . . now I can hook you up"—did not appear on the transcript of the tape recording.[5] Olive explained, however, that several portions of the audiotape were inaudible due to background music, overlapping voices, static, and other interference. On re-direct, the prosecution introduced Olive's prior written statement to DEA agents regarding the December 18 transaction to corroborate Olive's testimony concerning Rodney's statement. Olive read the relevant portion of his prior statement to the jury: "I saw a white pickup drive by and Fred said, 'there goes Melvin.' We walked outside and Melvin had another black male in the truck . . . . Rodney said, 'there goes my partner. I'm going to hook you up.'"

---

[5] The tape and transcript of the December 18 drug transaction were not admitted into evidence. However, Olive used the transcript to refresh his memory while testifying on the witness stand.

6

On January 30, 1997, Olive made yet another undercover drug purchase from Rodney and Robinson in the Heatherton Chase apartment complex parking lot. The government introduced audiotapes and transcripts of Olive's negotiations with Rodney and Robinson and a videotape of the transaction.

Appellant Jamie Perkins was also a mid-level crack cocaine dealer in Greenville. Several witnesses provided testimony implicating Perkins. Kelvin Ward, a paid confidential informant, did some work for Perkins installing a stereo system in his car. On January 28, 1997, Ward was at Jamie Perkins's house working on the stereo installation and observed Rodney Traylor drive up and hand a package to Perkins. Ward followed Perkins to the back of the house and observed Perkins cutting up the contents of the package, which Ward believed contained crack cocaine. The next day, on January 29, Ward and confidential informant Garfield Baker, Jr. arranged to purchase an ounce of crack cocaine from Perkins. That evening, Ward and Baker met with DEA agents who searched their vehicle and their persons to ensure that the informants did not have any drugs in their possession and equipped Baker with a body wire. Ward and Baker then drove to Perkins's home on Pine Street to consummate the deal. When they arrived, Perkins and a woman were seated in a vehicle in front of the house. Ward remained in the undercover vehicle while Baker exited and got into the back seat of Perkins's vehicle to make the purchase. During the transaction, Perkins pointed a sawed-off shotgun at Baker with his hand on the trigger. Baker exchanged $1,000 in cash for the drugs. Following the deal, Ward and Baker left and met with DEA agents and turned over the cocaine. Ward's and Baker's testimony was corroborated by a tape and transcript of the transaction. The shotgun was admitted into evidence based on Ward's and Baker's identification of the weapon as the shotgun brandished by Perkins. Ward was able to identify the weapon since he had seen it on dozens of prior occasions while installing Perkins's stereo system and had previously observed a shotgun shell in the chamber. DEA agent Ted Chapman analyzed the substance recovered in the transaction. His analysis determined that the substance had a net weight of 23.0 grams and contained cocaine base.

7

On February 11, 1997, Ward arranged to buy another ounce of crack cocaine from Perkins. While wearing a body wire, Ward went to Perkins's house on Pine Street and paid Perkins $1,000 in exchange for the drugs. A corroborating tape and transcript of the transaction were admitted at trial. DEA chemist Victor Bravenec analyzed the drugs recovered in this transaction and determined that the substance contained crack cocaine and had a net weight of 23.4 grams. The drugs and the chemical analysis report were admitted into evidence.

The testimony of several other witnesses also implicated the Traylor brothers and Robinson in the conspiracy. Arguster Robinson, a 77-year-old, cooperating co-conspirator testified that from approximately late 1993 until her arrest in March of 1997 she sold crack cocaine in Greenville, which she purchased on a regular basis from Melvin Traylor. She generally purchased a $100 or $200 piece about twice a week, usually Friday or Saturday, and again on the first of the month when she received her social security check. Melvin Traylor personally delivered the crack to her either at her residence or at her place of business. Datarvus Traylor and Fredrick Robinson also delivered crack cocaine to her and stated that it was from Melvin. Ella Reese Neal, another indicted co-conspirator testifying pursuant to a plea agreement, testified that she was a crack dealer in Greenville for several years and purchased crack from Melvin from 1994 until her arrest in March of 1997. At some point, Melvin asked her to sell drugs for him, but she refused. Except for a one-year hiatus during which she and Melvin argued over their respective territories, she purchased drugs from Melvin on almost a daily basis. She started out buying $50 quantities and eventually purchased larger quantities of up to a half an ounce at a time. During the six months before her arrest, Neal purchased crack directly from Melvin on at least two occasions. Other times the other Traylor brothers or Robinson would deliver the drugs to her. When she paged Melvin to purchase more drugs, either Melvin or one of his brothers would return the page. Following her arrest, Neal received two phone calls from Melvin, who told her to "be strong and don't sell out, don't say nothing."

Darrell Mitchell, also testifying pursuant to a plea agreement, assisted two other indicted

8

co-conspirators in obtaining crack cocaine from each of the Traylor brothers. Mitchell testified that in November or December of 1996, sometime during the holidays, he frequented a crack house at 2305 Langford run by J.C. Jones and Tony Tunson. When one of the Traylor brothers drove up to the house to deliver crack cocaine, Mitchell, at the direction of Jones and Tunson, would take the cash out to the street and exchange it for the crack cocaine. Mitchell testified that he purchased crack cocaine, on Jones's and Tunson's behalf, from each of the Traylor brothers on at least two or three separate occasions.

Brian Sheppard, a street-level crack dealer in Greenville, agreed to testify for the government in order "work off" a pending automatic weapons charge against him. Sheppard testified that he purchased crack from Melvin and Rodney Traylor beginning in 1993. In 1996, he bought directly from Melvin Traylor on one occasion and directly from Rodney Traylor on one occasion. Generally, when Sheppard paged Melvin to obtain more crack, a man named Curtis who worked for Melvin would deliver the drugs. Sheppard also paged Rodney to buy drugs. Rodney advised Sheppard that he obtained his crack from Melvin. If Rodney was temporarily out of stock when Sheppard paged him, he would explain that "Melvin hasn't brung [*sic*] it." On numerous occasions, Sheppard observed Melvin, Rodney, and Datarvus Traylor together counting large sums of money (thousands of dollars) at 4108 Park Street. Sheppard once observed Melvin in possession of a 9-mm. semi-automatic weapon and a large sum of cash and heard Melvin threaten to kill any law enforcement officers that attempted to come in. He also observed Datarvus in possession of a 12-gauge shotgun. Sheppard further testified that both Melvin and Rodney Traylor told Sheppard that a man named Ricky Pat had stolen drugs from Melvin and that Melvin threatened to kill Pat.

The Greenville investigation culminated with the execution of two search warrants on March 6, 1997. Sometime before 7:00 a.m., DEA agents and Greenville police officers executed a warrant at the residence of Datarvus Traylor at 1910 Division Street. The telephone number at this address was in Robinson's name. Datarvus Traylor was asleep in one of the bedrooms

("bedroom two"); Robinson and Turrell Davis, another indicted co-conspirator, were in the living room.  During the search of bedroom two, police found two 9-mm. pistols—one on the floor next to the bed and another in the closet.  Other evidence found in bedroom two included an electronic scale, a radio-shack security (metal detecting) wand, a police frequency scanner, 9-mm. ammunition, and over $1,000 in cash.  In the other bedroom ("bedroom one"), officers discovered close to an ounce of crack cocaine inside a dresser drawer, a letter addressed to Datarvus at 1910 Division Street, and photographs of Datarvus.  Datarvus supplied officers with the combination to a safe, where they recovered another $2,000 in cash.

Meanwhile, at approximately 6:30 a.m. on March 6, a second warrant was executed at 3402 Pine Street, the home of Jamie Perkins.  Police Officer Jim Patterson participated in the search and was the first officer to enter.  While conducting an initial sweep of the premises, Patterson encountered Perkins in one of the bedrooms, standing at the foot of the bed holding a small caliber handgun—later identified at trial as a Raven semi-automatic pistol.  After Officer Patterson hollered, "police, down," Perkins dropped the weapon on the floor.  Officers encountered other individuals inside the house during this initial sweep, including two adults and two or more children.  From one of the back bedrooms, inside the top drawer of a dresser, DEA agents discovered a brown vile containing a white powdery substance.  Subsequent chemical analysis confirmed that the substance contained cocaine base with a net weight of 4.7 grams.  The semi-automatic pistol was test-fired and determined to be functional.

## II.  DISCUSSION

A.    SUFFICIENCY OF THE EVIDENCE

1.    *Standard of Review*

All five appellants raise various sufficiency of the evidence challenges.  We employ a narrow scope of review when evaluating the sufficiency of the evidence to support a conviction. We must affirm the verdict "if a reasonable trier of fact could conclude from the evidence that the elements of the offense were established beyond a reasonable doubt, viewing the evidence in the

light most favorable to the verdict and drawing all reasonable inferences from the evidence to support the verdict." *United States v. Myers*, 104 F.3d 76, 78 (5th Cir. 1997). The evidence need not exclude every reasonable hypothesis of innocence, and the jury is free to choose among reasonable constructions of the evidence. *See United States v. Lopez*, 74 F.3d 575, 577 (5th Cir. 1996). We have repeatedly stated that the jury is the final arbiter of the credibility of witnesses. *See, e.g.*, *United States v. Davis*, 61 F.3d 291, 297 (5th Cir. 1995) ("It is well-settled that credibility determinations are the sole province of the jury."); *United States v. Payne*, 99 F.3d 1273, 1278 (5th Cir. 1996) ("[N]on-credibility is generally not a sound basis for alleging sufficiency of the evidence; it is the jury's function to determine credibility." (internal quotation marks omitted)). Thus, we view all credibility choices in the light most favorable to the verdict. *See United States v. Guerra-Marez*, 928 F.2d 665, 674 (5th Cir. 1991).

2. *The Conspiracy Convictions*

Melvin Traylor, Datarvus Traylor, Rodney Traylor, and Jamie Perkins challenge the sufficiency of the evidence supporting their convictions under count one of the indictment, which alleged a conspiracy to distribute crack cocaine. "To establish guilt of conspiracy to distribute cocaine under 21 U.S.C. §§ 841(a)(1), 846, the government must prove beyond a reasonable doubt (1) the existence of an agreement between two or more persons to commit one or more violations of the narcotics laws and (2) the defendant's knowledge of, (3) intention to join, and (4) voluntary participation in the conspiracy." *United States v. Lechuga*, 888 F.2d 1472, 1476 (5th Cir. 1989). Proof of an overt act in furtherance of the conspiracy is not required. *See id.* All of the elements of the offense may be established solely by circumstantial evidence. *See United States v. Westbrook*, 119 F.3d 1176, 1189 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 1059 (1998). The conspiratorial agreement need not be express; a tacit agreement will suffice, *see id.*, and may be inferred from "concert of action." *See Lechuga*, 888 F.2d at 1476. Likewise, knowledge of the agreement may be inferred from "surrounding circumstances." *See id.* at 1477. The government is not required to prove knowledge of all the details of the conspiracy or each of its

11

members, provided that the defendants' knowledge of the essentials of the conspiracy is established. *See United States v. Alvarez*, 625 F.2d 1196, 1198 (5th Cir. 1980). A defendant need only have had a minor role in the conspiracy, once it is shown that he voluntarily agreed to participate. *See Lechuga*, 888 F.2d at 1477. However, the government must prove more than mere knowledge of a conspiracy or association with conspirators. *See United States v. Grassi*, 616 F.2d 1295, 1301 (5th Cir. 1980). But, knowledge and association may be combined with other circumstantial evidence to prove an agreement to join a conspiracy. *See id.* at 1301-02. "Once the government has produced evidence of an illegal conspiracy, it need only introduce 'slight evidence' to connect an individual defendant to the common scheme." *Westbrook*, 119 F.3d at 1190. Moreover, we have repeatedly held that a guilty verdict may be sustained if supported only by the uncorroborated testimony of a co-conspirator, even one who is cooperating with the government pursuant to a plea agreement of promise of leniency. *See, e.g.*, *id.*; *United States v. Gadison*, 8 F.3d 186, 190 (5th Cir. 1993).

a.

We begin by addressing the Traylors' contentions that the testimony of the paid confidential informants and cooperating co-conspirators is either inadmissible or inherently unreliable and therefore insufficient to support their convictions. Rodney, relying on the Tenth Circuit panel opinion in *United States v. Singleton*, 144 F.3d 1343 (10th Cir. 1998), *overruled by* 165 F.3d 1297 (10th Cir. 1999) (en banc), asserts that the testimony of Olive, Sheppard, Pye, and Neal should have been suppressed as violative of 18 U.S.C. § 201(c)(2)[6] because they all received either monetary rewards, charge reductions, or sentencing concessions in exchange for their cooperation. Likewise, Melvin and Datarvus assert similar claims that the testimony of Olive, Sheppard, Neal, and Arguster Robinson is inherently unreliable due to the nature of the witnesses'

---

[6] 18 U.S.C. § 201(c)(2) prohibits directly or indirectly giving, offering, or promising anything of value to any witness in exchange for testimony under oath before a court, committee of either or both Houses of Congress, or before an agency, commission, or officer authorized to hear evidence or take testimony. *See* § 201(c)(2). A violation of this section is punishable by fine or imprisonment. *See id.*

12

agreements with the government and, consequently, that no reasonable jury could rely on their testimony to support their convictions. These arguments are without merit. The *Singleton* panel opinion has been vacated and overruled by the en banc Tenth Circuit, *see* 165 F.3d 1297 (10th Cir. 1999) (en banc), and has been squarely rejected by this Court, *see United States v. Haese*, 162 F.3d 359 (5th Cir. 1998), *cert. denied*, — S. Ct. —, No. 98-9005, 1999 WL 241837 (May 24, 1999)*; United States v. Webster*, 162 F.3d 308 (5th Cir. 1998). In *Haese*, we noted that co-conspirators are "frequently the most knowledgeable witnesses available to testify about criminal activity" of other co-conspirators and that "it is evident to this Court that Congress did not intend for section 201(c)(2) to be used when prosecutors offer lenity for a witness' truthful testimony." 162 F.3d at 366, 367. There is also nothing unusual or improper about the government promising benefits to a cooperating witness in exchange for truthful testimony against other criminal defendants. *See United States v. Cervantes-Pacheco*, 826 F.2d 310, 315-16 (5th Cir. 1987) (en banc) (holding that contingent compensation for witnesses may occur as long as the nature of such compensation is fully disclosed to the jury). Here the details of the witnesses' agreements with the government were fully disclosed to the jury. The testimony was neither inherently unreliable nor incredible on its face. *See United States v. Lindell*, 881 F.2d 1313, 1322 (5th Cir. 1989) (holding that the uncorroborated testimony of a co-conspirator is sufficient evidence by itself to support a conviction, unless so unbelievable on its face that it defies physical law). As noted above, the jury is the sole arbiter of credibility and could properly credit and rely on the testimony of these witnesses. *See, e.g., United States v. Davis*, 61 F.3d 291, 297 (5th Cir. 1995). With this in mind, we turn to the appellants' remaining arguments as to the sufficiency of the evidence supporting their conspiracy convictions.

b.

Melvin raises several additional arguments challenging the substance of the testimony against him. We reject each of these arguments. First, Melvin contends that no rational jury could believe Olive's testimony concerning Rodney's December 18 statement—"there goes my

13

boy . . . now I can hook you up"—because it was not on the transcript of the audiotape. To the contrary, being the sole judge of credibility, the jury could have reasonably believed Olive's plausible explanation that several portions of the tape were inaudible due to background music, overlapping voices, static, and other interference, particularly since Olive's testimony was corroborated by the prior written statement given to DEA agents.

Second, Melvin complains that Sheppard's testimony is not independently verifiable or capable of being disproved because Sheppard did not know the specific date in 1996 when he purchased cocaine from Melvin and did not know the last name of Curtis, the man who delivered drugs to Sheppard at Melvin's behest. This argument is also without merit as there is no requirement that testimony must be independently verified before it can be properly considered by the jury.

Third, Melvin argues that Arguster Robinson's testimony did not place any of the events within the time frame of the alleged conspiracy. We disagree. The indictment alleged a drug-trafficking conspiracy beginning from at least October 1994 and continuing until February 25, 1997, the date the grand jury issued the original indictment. On direct examination, Ms. Robinson affirmatively testified that she continuously purchased crack cocaine from Melvin on a regular basis—usually twice a week—from 1993 up until her arrest in March 1997. Melvin, however, points to Ms. Robinson's testimony on cross-examination that she purchased drugs from Melvin in 1993. In response to questioning by counsel for Melvin as to the year she purchased crack from Melvin, Ms. Robinson explained at length that she began dealing crack in late 1993—the year after her son died—due to financial difficulties. After this diatribe, counsel for Melvin repeated, "my question simply was when you talked about Melvin bringing stuff over, sending stuff over to your house, you're talking about 1993?" Ms. Robinson responded simply, "I am." This testimony is not inconsistent with her testimony on direct that she continuously purchased crack cocaine from Melvin from late 1993 until March 1997, and the jury could reasonably have interpreted this statement to refer only to the year she began dealing crack cocaine in Greenville

14

and purchasing drugs from Melvin.

Finally, Melvin argues that Neal's testimony concerning the conspiracy is contradictory. Neal testified on direct that during the six months prior to her arrest in March 1997, Melvin began sending someone to deliver the drugs to her—either Rodney, Datarvus, or Robinson. On cross-examination, however, when questioned by counsel for Robinson as to how he could have delivered drugs to her since he doesn't drive, Neal responded, "One of them brought it. I'm not sure which one it was. Either *Melvin* or Rodney or Datarvus. I don't know which one it was." Melvin asserts that these statements indicate that Neal did not distinguish between Melvin and his brothers and had no specific memory that Melvin sold drugs through another person. Despite Neal's inability to recall the specific individual that delivered drugs to her, the remainder of her testimony, coupled with the other evidence implicating Melvin was sufficient to sustain Melvin's conspiracy conviction.

c.

Datarvus Traylor raises many of the same arguments as his brother Melvin. To the extent Datarvus challenges the credibility of the witnesses, as discussed above, those arguments are without merit. Datarvus further argues that the government failed to prove the existence of an agreement or his participation in the conspiracy, particularly since he did not confess and was not implicated in any of the audiotapes introduced by the government. To the contrary, as set forth below, substantial evidence supports the existence of a tacit agreement between the Traylor brothers and Robinson to distribute crack cocaine and the jury's reasonable conclusion that each of these appellants, including Datarvus, knowingly, intentionally, and voluntarily participated in that conspiracy.

d.

The evidence was more than sufficient to establish the existence of a tacit agreement to distribute crack cocaine in Greenville and to prove that Melvin, Rodney, and Datarvus were active

15

participants.[7] Several witnesses testified that they purchased distributable quantities of crack cocaine from each of these appellants during the time frame alleged in the indictment. Melvin frequently enlisted his brothers and Robinson to make drug deliveries on his behalf. When Melvin's customers paged him, either he or his brothers would return the page. The Traylor brothers were seen, on several occasions, together at 4108 Park Street counting large sums of cash. Rodney Traylor specifically identified Melvin as his supplier and partner in the drug business. During the search of Datarvus's home at 1910 Division Street, agents seized almost an ounce of crack cocaine, weapons, drug paraphernalia, and over $3,000 in cash. Additionally, the government presented substantial evidence implicating Rodney and Datarvus in numerous substantive drug trafficking offenses. Contrary to the appellants' suggestions, this proof establishes more than mere association with persons involved in criminal activity, *cf. United States v. Burton*, 126 F.3d 666, 670 (5th Cir. 1997), and more than association due to a familial relationship, *cf. United States v. Broussard*, 80 F.3d 1025, 1031 (5th Cir. 1996). Considering this evidence as a whole, the jury could readily conclude that there was a tacit agreement between the Traylor brothers and Robinson to distribute crack cocaine, and that each of these appellants knowingly, intentionally, and voluntarily participated in the conspiracy.

e.

Jamie Perkins argues that the evidence is insufficient to connect him to the conspiracy because it shows no more than a single drug transaction between him and another co-conspirator, Rodney Traylor. In fact, the government concedes that the evidence insufficient. We agree. It is well settled that a conviction for conspiracy to distribute narcotics cannot rest upon a single sale or transaction between a buyer and a seller. *See, e.g.*, *United States v. McKinney*, 53 F.3d 664, 672 (5th Cir. 1995) ("Proof of buyer-seller agreement, without more, is not sufficient to tie a buyer to a conspiracy."); *United States v. Thomas*, 12 F.3d 1350, 1365 (5th Cir. 1994) ("[I]f the

---

[7] Fred Robinson did not appeal his conviction on the conspiracy count, and, as discussed below, we conclude that the evidence is insufficient to sustain Perkins's conspiracy conviction.

evidence demonstrates only that someone purchased drugs from the conspiracy and did not agree to join it, 'the elements necessary to prove a conspiracy would be lacking . . . .'" (citation omitted)).  Here, the only evidence connecting Perkins to the Traylor organization was Kelvin Ward's testimony that he observed Rodney Traylor deliver a package to Perkins and later observed Perkins cutting up the contents of the package, which Ward testified was crack cocaine. None of the other proof connected Perkins with the members of the conspiracy.  We therefore reverse Perkins's conspiracy conviction as it cannot be based solely on a single purchase of crack cocaine from Rodney Traylor.

We also reject Perkins's argument that the district court erroneously calculated his total offense level based on drug quantities connected to the conspiracy.  Our review of the record confirms that Perkins's offense level was calculated based on 51.1 grams of cocaine base, the quantity which Perkins personally distributed or possessed.  The chemical analysis reports admitted at trial established that Perkins was responsible for the following drug quantities: distribution of 23.0 grams on January 29, 1997 (count 21); distribution of 23.4 grams on February 11, 1997 (count 24); possession of 4.7 grams on March 6, 1997 (count 25).  The defendant's Presentence Report confirms that his base offense level of 32 was calculated based solely on this amount and not on any other drug quantities related to the conspiracy.  Though we vacate the conviction and sentence on count one, the conspiracy conviction had no impact on the sentence imposed for the remaining counts, and we therefore affirm the sentences imposed on all other counts.

3.    *The Distribution Convictions*

Datarvus Traylor, Rodney Traylor, Robinson, and Perkins challenge the sufficiency of the evidence supporting their convictions for distribution of cocaine base or aiding and abetting the distribution, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, respectively.  If the defendant acted alone, we will sustain a distribution conviction if a rational jury could have found beyond a reasonable doubt "that the defendant (1) knowingly (2) distributed (3) the controlled

17

substance." *See United States v. Sotelo*, 97 F.3d 782, 789 (5th Cir. 1996). We will sustain the convictions for aiding and abetting distribution of cocaine base if a rational jury could have found "that the defendant: i) associated with the criminal enterprise, ii) participated in the venture, and iii) sought by action to make the venture succeed." *United States v. Mergerson*, 4 F.3d 337, 342 (5th Cir. 1993).

a.

Datarvus Traylor argues that the evidence was insufficient to support his convictions for distribution of crack cocaine on September 18, 1996 (count 5) and November 13, 1996 (count 7). With respect to the September 18 transaction, Datarvus argues, without supporting authority, that Officer Wilson's identification of him as the seller was suspect and was not sufficient to show beyond a reasonable doubt that Datarvus was, in fact, the person who sold the drugs. Specifically, he argues that the probability of misidentification was strong because Wilson based his identification on statements by Olive and the unknown dealer that the seller's name was Datarvus. This argument is without merit. Wilson testified that although Olive told him the seller's name was Datarvus, he made an independent identification of Datarvus four days after the transaction from Datarvus's driver's license photograph. As the government points out, Wilson had ample opportunity during the purchase to get a close look at Datarvus. The four day time period between the purchase and the photo identification was short and does not undermine the reliability of the identification. Wilson also specifically identified Datarvus again at the trial. The jury could reasonably rely on Wilson's identification of Datarvus and find beyond a reasonable doubt that Datarvus knowingly distributed crack cocaine on September 18, 1996.

Datarvus also challenges his conviction under count seven for aiding and abetting distribution of crack cocaine on November 13, 1996. The evidence supporting this count consisted of the testimony of confidential informant Olive, the drugs recovered from the transaction, and the report of the DEA chemist's laboratory analysis. This evidence established that Olive met with Michael Bowen, inquired about purchasing some crack, and drove with

18

Bowen over to 4108 Park Street to obtain the drugs. Olive gave Bowen the money, but remained outside in the car while Bowen went into the house. After Bowen returned to the car, he delivered five $100 slabs of crack cocaine, 20.4 grams, and recounted to Olive his drug transaction with Datarvus inside the house. Datarvus argues that this evidence is insufficient to prove beyond a reasonable doubt that he aided and abetted Bowen in the distribution. Datarvus complains that Olive did not personally witness the hand-to-hand exchange and asserts that Bowen may have lied to Olive and could have had the drugs stored on his person or stashed inside the house. We reject this argument. It is well-settled that when considering a sufficiency challenge, "the evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt. . . . A jury is free to choose among reasonable constructions of the evidence." *United States v. Mulderig*, 120 F.3d 534, 551 (5th Cir. 1997) (internal quotation marks omitted), *cert. denied*, 118 S. Ct. 1510 (1998). The jury could have reasonably concluded that Bowen had no reason to fabricate the purchase of crack cocaine from Datarvus. The evidence was sufficient for the jury to find all the elements of the crime beyond a reasonable doubt.

b.

Rodney Traylor and Robinson argue that the evidence was insufficient to support their convictions for distribution of cocaine base (counts 8, 9, 10, 13, 18, and 23) and Robinson's conviction for possession with intent to distribute cocaine base (count 28) because the government failed to prove beyond a reasonable doubt that the substances tested by the DEA chemists and admitted into evidence were the same substances purchased or seized from the appellants by the government agents. Specifically, these appellants assert that the testimony of DEA Special Agent Clay Morris that the substances were received from "confidential informants," "confidential sources," or "pursuant to a search warrant" was too vague as a matter of law to sufficiently connect the evidence to the appellants. We disagree.

Agent Morris provided chain-of-custody testimony with respect to the drugs admitted at

19

trial. For each exhibit containing substances purchased or seized from the appellants, Morris identified the date the exhibit was received and whether it was received from a confidential source, an undercover officer, or pursuant to a search warrant. He testified that after he received a substance, it was processed pursuant to DEA regulations, *i.e.*, the substance was heat-sealed in an evidence bag, labeled, initialed, and maintained until submitted to the laboratory for analysis. Morris testified that he was able to correctly identify each exhibit as the drugs recovered from the appellants based on the exhibit numbers on the evidence bags, the corresponding lab report, and his signature and initials. Later in his testimony, Morris identified the persons he received the drugs from as confidential informants Olive, Baker, and Garfield and undercover officers Wilson and Underwood. Additionally, each exhibit had attached to it a DEA Form 7—Report of Drug Property Collected, Purchased or Seized—that (1) identified the confidential informant by his identification number, the appellant from whom the substance was purchased or the residence from which the substance was seized, and the date of purchase or seizure; (2) set forth the chain of custody for the exhibit; and (3) summarized the chemist's analysis. Each exhibit was admitted into evidence without any objections regarding a break in the chain of custody or failure to properly connect the exhibits to the appellants.

Assuming *arguendo* that the testimony alone was insufficient to connect the drugs to the appellants, we nevertheless hold that a rational jury could find beyond a reasonable doubt that the drug exhibits admitted at trial were indeed the drugs purchased or seized from the appellants. In *Marks v. United States*, 310 F.2d 49, 52 (5th Cir. 1962), we rejected a similar sufficiency challenge based on the failure of the trial testimony to connect the drugs to the appellant. We explained:

> While it is true that the *printed* record fails to disclose any evidence which properly connects the drugs as testified to and admitted in evidence with the drugs purchased from appellant, this defect is remedied by an examination of the exhibits themselves. These exhibits were, of course, introduced upon the trial of the case and were available for examination and inspection of the trial judge . . . . While the government could have, and possibly should have, read into the record the numbers and identifying marks on the several exhibits, it was not necessary, and there was no error in the failure to so do. The exhibits containing the drugs that

20

form the basis for each count were properly and sufficiently identified, traced, and connected to the appellant.

*Id.* As in *Marks*, the exhibits in this case were each clearly marked, identified, and properly traced to the appellants.

c.

Jamie Perkins challenges the sufficiency of the evidence supporting his convictions for distribution of cocaine base on January 29, 1997 and February 11, 1997 (counts 21 and 24) because of a fatal variance between the amount of crack cocaine alleged in the indictment and the amount proven at trial. Alternatively, Perkins argues that the sentence imposed by the district court was erroneously based upon the drug quantities alleged in the indictment, rather than the quantities proven at trial. "A variance occurs where the evidence proves facts different from those alleged in the indictment, but does not modify an essential element of the charged offense." *United States v. Salvatore*, 110 F.3d 1131, 1145 (5th Cir. 1997). We apply a harmless error standard of review and will reverse a conviction only if the variance prejudiced the defendant's substantial rights. *See id.* Here, we need not reach the question of prejudice since our review of the record reveals that no such variance occurred.[8]

We first point out that the quantity of drugs is not an element of the offense of distribution of a controlled substance. *See* 21 U.S.C. § 841(a)(1). The government was required to prove only that the substance distributed by the defendant contained a detectable amount of a controlled substance. Nevertheless, the evidence adduced at trial, viewed in the light most favorable to the government, did in fact establish that Perkins distributed the drug quantities alleged in the indictment. Count twenty-one of the indictment charged Perkins with distribution of approximately 23.0 grams of cocaine base on January 29, 1997. The drugs and the chemical analysis report—government exhibits 176 and 177—were admitted into evidence. DEA chemist Ted Chapman testified that he analyzed the drugs recovered from this transaction and determined

_____

[8] Finding no variance, we reject Perkins's related argument that his sentence was improperly based on a quantity of drugs not proven at trial.

21

that the substance contained cocaine base.[9]  His chemical analysis report expressly provides that the drugs had a net weight of 23.0 grams.  There was no variance between the indictment and the proof as to this count.

Count twenty-four of the indictment charged Perkins with distribution of approximately 23.4 grams of cocaine base on February 11, 1997.  Again, the drugs and the chemical analysis reports for this transaction were admitted into evidence.  DEA chemist Victor Bravenec performed the chemical analysis on this substance, government exhibit 185, and memorialized his findings in government exhibit 186.  According to the trial transcript, Bravenec testified that the substance had a net weight of 2.4 grams and contained cocaine base.  *See* R. Vol. 10, at 179.  However, his chemical analysis report, which was attached to the exhibit and admitted into evidence, expressly provides that the substance had a net weight of 23.4 grams, as alleged in the indictment.  Despite the apparent discrepancy between Bravenec's testimony and the chemical analysis report, viewing the evidence in the light most favorable to the government, we conclude that there was no variance between the indictment and the proof on this count since the chemical

---

[9]  Perkins erroneously asserts that the testimony of DEA chemist Victor Bravenec established that the substance recovered from the January 29 sale had a net weight of only 2.4 grams.  Although Bravenec tested the majority of the drugs recovered in this case, he did not conduct the analysis for government exhibit 176.  While on the witness stand, Bravenec identified each drug exhibit and summarized the results of his analysis.  After identifying numerous other exhibits and reports, the prosecution asked Bravenec about exhibit 176.  After a brief off-the-record discussion with the prosecution, Bravenec mentioned exhibit 176, but then corrected himself and testified concerning exhibits 185 and 186—the drugs recovered from the February 11 transaction and the corresponding chemical analysis report.  According to the trial transcript, the following exchange occurred:

> "Q.  Government's Exhibit 176, sir?"
> (Sotto voce discussion between Jarrett and witness.)
> "A.  Exhibit 176 -- Government's Exhibit 185 was sealed as the same as [*sic*] other exhibits.  It contained a net weight of 2.4 grams and the controlled substance of cocaine base."
> "Q.  Memorialized in Government's Exhibit 186?"
> "A.  Yes, it is."

R. Vol. 10, at 179.  After Bravenec concluded his testimony on direct examination, the prosecution moved to admit each exhibit to which Bravenec had testified, but did not move to admit exhibits 176 or 177 at this time.  Thus, the record reveals that Bravenec provided no substantive testimony with respect to the drugs recovered from the January 29 transaction.

analysis report, which was available for examination by the jury, established that the substance contained 23.4 grams of crack cocaine.

4.  *The Possession with Intent to Distribute Convictions*

Appellants Datarvus Traylor, Robinson, and Perkins also challenge the sufficiency of the evidence supporting their convictions for possession with intent to distribute cocaine base. This offense requires proof beyond a reasonable doubt that the defendant (1) knowingly (2) possessed crack cocaine (3) with the intent to distribute it. *See* 21 U.S.C. § 841(a)(1); *United States v. Ortega Reyna*, 148 F.3d 540, 543-44 (5th Cir. 1998). Possession may be actual or constructive and may be proved by direct or circumstantial evidence. *See United States v. Onick*, 889 F.2d 1425, 1429 (5th Cir. 1990). This Court employs a "commonsense, fact-specific approach" in determining constructive possession. *United States v. McKnight*, 953 F.2d 898, 902 (5th Cir. 1992). Constructive possession is defined as ownership, dominion, or control over illegal drugs or dominion over the premises where drugs are found. *See Onick*, 889 F.2d at 1429. Constructive possession need not be exclusive, but can be joint with another person. *See McKnight*, 953 F.2d at 901. However, dominion or control over premises or drugs will not be lightly imputed to one found in another person's home. *See Onick*, 889 F.2d at 1429. In such joint occupancy cases, more evidence than the defendant's mere physical proximity to the controlled substance is required. *See McKnight*, 953 F.2d at 901. Rather, "there must be some evidence supporting at least a plausible inference that the defendant had knowledge of and access to the weapon or contraband." *Mergerson*, 4 F.3d at 349. "Intent to distribute 'may be inferred from the presence of distribution paraphernalia, large quantities of cash, or the value and quality of the substance.'" *United States v. Cardenas*, 9 F.3d 1139, 1158 (5th Cir. 1993). The issue raised by each of these appellants is whether the evidence was sufficient to establish constructive possession.

a.

Datarvus Traylor and Robinson were both convicted of count twenty-eight of the

23

indictment, which alleged that on or about March 6, 1997, the appellants, aided and abetted by each other, knowingly possessed with the intent to distribute 27.4 grams of cocaine base. As previously stated, the appellants may be convicted of aiding and abetting possession of crack cocaine with intent to distribute if the evidence shows that they associated with the criminal venture, participated therein, and actively sought its successful conclusion. *See Mergerson*, 4 F.3d at 342.

These convictions pertain to the drugs seized during search of the residence at 1910 Division Street. Datarvus and Robinson both assert that the evidence was insufficient to prove their constructive possession of the drugs because other persons lived or were present at the residence when the drugs were seized. As summarized above, the evidence established that state law enforcement officers and DEA agents executed a search warrant at 1910 Division Street on March 6, 1997, between 6:00 a.m. and 7:00 a.m. Datarvus was found sleeping in bedroom two, where agents also seized two 9-mm. pistols, ammunition, an electronic scale, a police frequency scanner, and over $1,000 in cash. The cocaine was discovered in a dresser drawer in bedroom one, along with a letter addressed to Datarvus at the Division Street address and photographs of Datarvus. Robinson and Turrell Davis were found in the living room area. Datarvus gave the agents to the combination to a safe located in the house, where the agents discovered another $2,000 in cash. The telephone at this address was listed in Fred Robinson's name.

Datarvus argues that there was no proof that he knew that the cocaine was in the dresser in bedroom one or that he had constructive possession of it. He contends that the drugs might have belonged to Davis or that Robinson may have put the drugs in the dresser. However, the jury could reasonably infer from the above evidence that Datarvus resided in the house and had dominion over the premises based on (1) his presence in the house during the early morning hours when the warrant was executed, (2) the letter addressed to him at the Division Street address, (3) the photographs, and (4) the fact that he knew the combination to the safe located on the premises. The jury could also infer that Datarvus had access to the bedroom in which the drugs

24

were found since the letter and photographs were found in the same room. Coupled with the drug paraphernalia found during the search, the quantity of drugs seized, and the substantial evidence of Datarvus's involvement in the conspiracy, there was ample evidence from which the jury could find that Datarvus knowingly possessed the crack cocaine with the intent to distribute it.

b.

Robinson asserts that the evidence was insufficient to prove his constructive possession because no evidence other than his mere presence in the house connected him to the cocaine found in bedroom one. Because Robinson failed to move for a judgment of acquittal on the possession count, we review only for plain error. *See United States v. Calverley*, 37 F.3d 160, 162-64 (5th Cir. 1994) (en banc). Under this standard, the appellant must show that (1) there is an error, (2) the error is plain, and (3) the error affected his substantial rights. *See United States v. Olano*, 507 U.S. 725, 732-35, 113 S. Ct. 1770, 1776-78, 123 L. Ed. 2d 508 (1993). If the appellant is able to establish these factors, the decision to correct the error falls within this Court's sound discretion. *See Calverly*, 37 F.3d at 164. We will correct such errors on appeal only if they "seriously affect the fairness, integrity, or public reputation of judicial proceedings." *Id.* (internal quotation marks omitted).

Robinson relies primarily on *Mergerson*,[10] *Onick,*[11] and similar constructive possession

---

[10] In *Mergerson*, we held that the evidence was insufficient to establish the defendant's constructive possession of a weapon found between the mattress and box springs of a bed located in a bedroom that the defendant shared with his girlfriend. *See* 4 F.3d at 348-49. We noted that the weapon was not in plain view, there was no other circumstantial evidence that the defendant knew of the gun, and there was evidence that the defendant's girlfriend actually purchased the gun long before the defendant moved in. *See id.* at 349. We explained that "mere control or dominion over the place in which contraband or an illegal item is found *by itself* is not enough to establish constructive possession when there is joint occupancy of a place;" rather, there mut be "some evidence supporting at least a plausible inference that the defendant had knowledge of and access to the weapon or contraband." *Id.* (emphasis added).

[11] In *Onick*, the defendant and her boyfriend, Tolliver, were convicted of various drug offenses including conspiracy, distribution, and possession with intent to distribute heroin and cocaine. *See* 889 F.2d 1425, 1428 (5th Cir. 1989). With respect to Onick's possession conviction, we held that the following evidence was insufficient to establish her constructive

cases involving joint occupants,[12] in which this Court has held that a defendant's mere presence at the location where drugs or weapons are found is insufficient to establish constructive possession. The present case is distinguishable from both *Mergerson* and *Onick*. Here, Robinson's conviction based on constructive possession of the drugs discovered in bedroom one was not based *solely* on his mere presence at the house. There was some evidence that Robinson resided at the house since the telephone was listed in his name. Moreover, from the substantial evidence of Robinson's participation in the drug-trafficking conspiracy and his involvement in numerous drug transactions, the jury could readily infer that Robinson "had knowledge of and access to the . . . contraband." *Mergerson*, 4 F.3d at 349. The evidence was sufficient to support Robinson's conviction on count twenty-eight.

c.

Perkins argues that the evidence was insufficient to establish his constructive possession of the 4.7 grams of crack cocaine found in a dresser drawer in a back bedroom during the March 6 search of his home on Pine Street. Also relying on *Mergerson*, Perkins asserts that there was no evidence that he had dominion and control over the bedroom in which the drugs were found. The evidence supporting the jury's finding that Perkins constructively possessed the cocaine, however, is not based *solely* on his joint occupancy of the residence. As the government points out, the evidence also established that Perkins dealt drugs from this residence. Rodney Traylor delivered

_____

possession of the drugs: (1) Onick's presence at the apartment when the search was executed, (2) women's clothing found in a bedroom closet, (3) the discovery of a photograph of Onick, Tolliver, and a third individual, and (4) Onick's prior dealings with a locksmith who installed a safe on the premises. *See id.* at 1429. No other evidence linked her to the drug conspiracy or the drugs discovered in the search.

[12] *See, e.g.*, *United States v. Sneed*, 705 F.2d 745, 749-50 (5th Cir. 1983) (holding that evidence was insufficient to establish constructive possession of marijuana stored at one of the houses located on defendant's father's property where the evidence showed only that defendant's father was a key player in a marijuana importation scheme, the defendant was present at the house the day before the drugs were stored, and the evidence failed to show that the defendant was the son who occupied the house); *United States v. Martin*, 483 F.2d 974, 974-75 (5th Cir. 1973) (holding that defendant's presence in same room with roommate who had drugs in her possession along with evidence that defendant may have known about the drug sale was insufficient to establish constructive possession).

26

drugs to Perkins's home on January 28. Perkins advised Ward and Baker to meet him at "his house" on Pine Street and later consummated the January 29 deal in his car in front of the house. On February 11, Perkins made another drug sale to Ward inside the house. From this evidence the jury could readily infer that Perkins knew the drugs were in the house, had dominion and control over the drugs, and intended to distribute them.

B.      MULTIPLE CONSPIRACY INSTRUCTION

Melvin Traylor, Robinson, and Rodney Traylor contend that the district court erred by failing to give a "multiple conspiracy" instruction. Melvin and Robinson requested the instruction below, but Rodney did not. We review the district court's refusal to give Melvin's and Robinson's requested instruction for an abuse of discretion. *See United States v. Castaneda-Cantu*, 20 F.3d 1325, 1333 (5th Cir. 1994). Because Rodney failed to request the instruction at trial, we review only for plain error. *See id.* at 1334.

A multiple conspiracy charge instructs the jury to acquit if it finds that the defendant was not a member of the indicted conspiracy, but rather was involved in another non-charged conspiracy. As a general rule, a multiple conspiracy instruction is warranted if the defendant makes a timely request for such an instruction and his theory has legal and evidentiary support. *See id.* at 1333. "A multiple conspiracy instruction is generally required where the indictment charges several defendants with one (1) overall conspiracy, but the proof at trial indicates that some of the defendants were *only* involved in separate conspiracies *unrelated* to the overall conspiracy charged in the indictment." *Id.* (internal quotation marks omitted) (second emphasis added). We will find reversible error if there is any evidence in the record to support the defendant's multiple conspiracy theory. *See United States v. Erwin*, 793 F.2d 656, 662 (5th Cir. 1986). In determining whether the evidence supports a single or multiple conspiracies, we consider the following factors: "(1) the time frame; (2) the locations of the events charged as part of the conspiracy; (3) the persons acting as co-conspirators; (4) the statutory offenses charged in the indictment; and (5) the overt acts or other description of the offense charged which indicate

27

the nature and scope of the activity that the government seeks to punish in the case." *Id.*

Count one of the superseding indictment alleged that from at least October 1994 and continuing until February 25, 1997 (the date the original indictment issued), twenty individuals, including all five appellants, engaged in a conspiracy to (1) distribute more than one and one-half kilograms of crack cocaine and (2) to possess with the intent to distribute more than one and one-half kilograms of crack cocaine. Melvin argues that he was entitled to a multiple conspiracy instruction because the evidence against him clearly gave rise to the possibility that he only conspired with two or three others in 1994 and was never a part of the widespread conspiracy described in count one. Robinson concedes that the evidence showed that he formed a criminal partnership with Rodney Traylor, but that it failed to establish that he was a part of the larger conspiracy since there was no evidence of joint action with any of the other eighteen co-conspirators. Robinson also points out that he did not live in Greenville until July 1996, almost two years after the alleged conspiracy began. In a similar vein, Rodney Traylor argues that, at best, the evidence showed only that he engaged in a conspiracy with Melvin and Robinson and did not establish any connection with the other indicted conspirators.

We conclude that the district court did not abuse its discretion in refusing to the requested jury instruction and did not commit plain error with respect to Rodney Traylor. Here, there was no evidence supporting the existence of a separate conspiracy. First, the government was not required to connect each appellant to all of the alleged co-conspirators, s*ee United States v. Alvarez*, 625 F.2d 1196, 1198 (5th Cir. 1980) (en banc) ("The government was not required to prove that Alvarez had knowledge of all the details of the conspiracy or each of its members . . . ."), particularly when only five of the alleged conspirators were on trial. As the government points out, any failure to introduce evidence implicating the other indicted conspirators means only that the government failed to prove their involvement in the conspiracy. Nevertheless, there was evidence tying several of the other indicted co-conspirators to the

conspiracy alleged in count one.[13]  Second, Robinson's contention that a multiple conspiracy instruction was warranted because he jointed the conspiracy after it began is without merit.  *See United States v. Johnson*, 68 F.3d 899, 904 (5th Cir. 1995) ("[T]he fact that [one co-conspirator] later joined the existing conspiracy does not turn the single conspiracy into two separate conspiracies.").  Third, based on the *Erwin* factors set forth above, all of the evidence pointed to a single drug distribution conspiracy in which Melvin Traylor was the main supplier and Robinson, Rodney, and Datarvus were active participants.  The testimony showed that Rodney, Datarvus, and Robinson routinely delivered crack for Melvin to various street-level dealers in Greenville over a period spanning from late 1993 until 1997.  Melvin also personally distributed drugs during this period.  Rodney identified Melvin as his supplier to both Sheppard and Olive.  The Traylors and Robinson used the same drug dealing locations—4108 Park Street, a car wash around the corner, and the Heatherton Chase apartment complex.  The three Traylor brothers were seen, on more than one occasion, counting large sums of cash together at 4108 Park Street.  The telephone at Datarvus's home at 1910 Division Street was in Robinson's name, and Robinson was present during the early morning search of this location where drugs, drug paraphernalia, a large sum of cash, and weapons were discovered.  The overt acts charged in the indictment and the substantive drug offenses for which the appellants were ultimately convicted are all consistent with the single conspiracy charged in count one.  The evidence demonstrates that all of the appellants directed their efforts towards the accomplishment of a single goal or common conspiracy.  *See United States v. Elam*, 678 F.2d 1234, 1245 (5th Cir. 1982).  The district court did not err by refusing to give the multiple conspiracy instruction.

C.    PERKINS'S § 924(C) FIREARMS CONVICTIONS

Jamie Perkins was convicted of two counts of using or carrying a firearm during or in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1).  Count twenty-two

---

[13]  The evidence adduced at trial also implicated alleged co-conspirators Arguster Robinson, Chandra Pye, Ella Reese Neal, Johnny Morris, Michael Bowen, J. C. Jones, and Tony Tunson in the conspiracy.

charged Perkins with using and carrying a Springfield 12 gauge sawed-off shotgun during and in relation to the January 29 distribution of crack cocaine. Count twenty-seven charged Perkins with using and carrying a Raven .22 caliber pistol during and in relation to the March 6 possession with intent to distribute crack cocaine. He challenges these convictions on two fronts. First, Perkins argues the district court's erroneous instruction on the "use" prong of the offense constituted plain, reversible error. Second, as to count twenty-two, Perkins challenges the sufficiency of the evidence supporting the conviction and asserts that the jury charge did not include an essential element of the offense.

       1.      *Erroneous Instruction on the "Use" Prong of § 924(c)*

      Section 924(c)(1) imposes a mandatory prison term on "any person who, during and in relation to any . . . drug trafficking crime . . . , uses or carries a firearm." 18 U.S.C. § 924(c)(1). To establish that Perkins violated this statute, the government was required to prove beyond a reasonable doubt either that Perkins "used" a firearm during and in relation to the drug trafficking offense or that Perkins "carried" a firearm during and in relation to the drug trafficking offense. In *Bailey v. United States*, 516 U.S. 137, 116 S. Ct. 501, 133 L. Ed. 2d 472 (1995), the Supreme Court held that a conviction under the "use" prong of § 924(c)(1) "requires evidence sufficient to show an *active employment* of the firearm by the defendant, a use that makes the firearm an operative factor in relation to the predicate offense." *Id.* at 143, 116 S. Ct. at 505 (emphasis added). Delineating the types of activities that fall within this definition of "use," the Court explained that, although mere possession is not sufficient, "[t]he active-employment understanding of 'use' certainly includes brandishing, displaying, bartering, striking with, and most obviously firing or attempting to fire a firearm." *Id.* at 148, 116 S. Ct. at 508.

      We agree that the district court's "use" instruction amounted to plain error. The jury was charged as follows:

> The government is not required to prove that the defendant actually fired the weapon or brandished it at someone in order to prove "use," as that term is used in this instruction. However, you must be convinced beyond a reasonable doubt that the firearm played a role in or facilitated the commission of a drug offense. In

30

other words, you must find that the firearm was an integral part of the drug offense charged. Possession, as that term has been previously defined for you, may alone constitute use if you are convinced beyond a reasonable doubt that the firearm involved was an integral part of the drug trafficking offense.

R. Vol. 11, at 42-43. Because Perkins did not object to this instruction at trial, we review only for plain error. *See United States v. Kubosh*, 120 F.3d 47, 48 (5th Cir. 1997). Relying on *Bailey*, we have held that an instruction such as the one given in this case amounts to plain error because it does not instruct the jury that the defendant must have *actively employed* the firearm during the predicate offense and permits the jury to convict on an improper basis. *See Kubosh*, 120 F.3d at 48-49. Nevertheless, in *United States v. Brown*, 161 F.3d 256 (5th Cir. 1998) (en banc), we adopted a harmless error rule in cases in which a jury convicts a defendant under § 924(c)(1) pursuant to an erroneous pre-*Bailey* "use" instruction. *See id.* at 257-59. There, we determined that an erroneous "use" instruction is harmless if "the jury found beyond a reasonable doubt the facts necessary to support a conviction for 'carrying.'" *Id.* at 259. As recently clarified by the Supreme Court in *Muscarello v. United States*, 118 S. Ct. 1911 (1998), a defendant may be convicted under the "carry" prong of § 924(c)(1) if he carries the weapon on his person during and in relation to the predicate offense, *see id.* at 1915 ("No one doubts that one who bears arms on his person 'carries a weapon.'"); *id.* at 1920 (Ginsburg, J., dissenting) ("It is uncontested that § 924(c)(1) applies when the defendant bears a firearm, *i.e.*, carries the weapon on or about his person . . . ."), and also if he knowingly possesses and conveys the firearm in a vehicle during and in relation to the predicate offense, *see id.* at 1914-19.

In this case, the improper "use" instruction was harmless error because the only evidence before the jury on these counts clearly established that Perkins actually brandished the weapon during and in relation to the predicate offenses. Hence, the jury must have found beyond a reasonable doubt the facts necessary to support the convictions under the "carry" prong. With respect to the January 29 transaction, the testimony of Ward and Baker established that Perkins pointed the sawed-off shotgun at Baker during the drug deal with his hand on the trigger. Similarly, Officer Patterson testified that when he first encountered Perkins during the March 6

31

search of his home, Perkins was holding a small caliber pistol in his hand.  During the search, agents also recovered a distributable quantity of crack cocaine.  We hold, therefore, that the erroneous "use" instruction was harmless.

In so holding, we reject Perkins's argument that this case is distinguishable from *Brown* because, with respect to the March 6 conviction, there was no drug transaction underway when the search was executed.  The statute expressly criminalizes carrying a firearm during and in relation to *any* drug trafficking offense, including possession with intent to distribute, and does not require a contemporaneous drug transaction.  We are also unpersuaded by Perkins's assertion at oral argument that, under the analytical framework set forth in *United States v. Golden*, 102 F.3d 936 (7th Cir. 1996), a remand is required because there was evidence of multiple firearms events, only some of which could support a conviction under either the "use" or the "carry" prong.[14]  To the contrary, as noted above, because all of the evidence presented to the jury on both counts supported a conviction under the "carry" prong of § 924(c)(1) there is no justification for concluding that the jury may have convicted Perkins on an improper basis.

2.        *Sufficiency of the Evidence on Count 22*

Perkins also challenges the sufficiency of the evidence supporting his § 924(c)(1) conviction under count twenty-two of the indictment—using or carrying a sawed-off shotgun during the January 29 drug deal with Ward and Baker.  Specifically, he first asserts that the

_____

[14]  The Seventh Circuit in *Golden* set forth a three-part analytical framework for reviewing § 924(c)(1) convictions in which the jury received an erroneous "use" instruction.  *See* 102 F.3d at 947.  The court explained the framework as follows:

> (1) if *all* the firearms evidence presented qualifies as either active-employment "use" or "carry," we will affirm the conviction despite the bad instruction; (2) if *none* of the evidence presented qualifies as either active-employment "use" or "carry," we will reverse the conviction outright; and (3) if *some* of the evidence presented could qualify as either active-employment "use" or as "carry," *but other* firearms evidence presented exemplifies only possession or some other type of now-defunct, inactive "use," we will reverse the conviction and remand for a new trial, since we cannot be sure whether the jury convicted on the proper basis or the improper basis.

*Id.* (emphasis added).

32

government failed to prove that the shotgun used in the January 29 drug transaction met the statutory definition of a firearm as set forth in 18 U.S.C. § 921(a)(3), *i.e.*, that it was "designed to or [could] readily be converted to expel a projectile by the action of an explosive." He complains that there was no evidence that the shotgun was test-fired, as was the case with the Raven .22 caliber pistol in count twenty-seven, and no specific testimony that the gun met the statutory definition of § 921(a)(3). Second, he asserts that an essential element of the offense is the defendant's knowledge that the weapon met the statutory criteria, and the evidence was insufficient to establish his knowledge.[15] In a similar vein, Perkins contends that the district court plainly erred by failing to instruct the jury on the knowledge element.[16]

We conclude that there was sufficient evidence from which a rational jury could find that the shotgun in question was indeed a firearm, *i.e.*, that it was designed to expel a projectile by means of an explosive, and that Perkins knew the weapon was a firearm. In *United States v. Polk*,

---

[15] Perkins relies on *United States v. Reed*, 114 F.3d 1053 (10th Cir. 1997) and *Staples v. United States*, 511 U.S. 600, 114 S. Ct. 1793, 128 L. Ed. 2d 608 (1994) to support his proposition that the government must prove, as an essential element of a § 924(c)(1) offense, that the defendant used or carried the firearm *knowing* that it met the statutory definition set forth in § 921. We note that neither *Reed* nor *Staples* addressed § 924(c). Rather, *Reed* concerned a felon in possession conviction under 18 U.S.C. § 922(g) and its relevant penalty provision, § 924(a)(2), which expressly includes a knowledge requirement. *See Reed*, 114 F.3d at 1056 (quoting § 924(a)(2) ("[w]hoever knowingly violates subsection (g) . . . of section 922 shall be fined as provided in this title")). *Staples* concerned a conviction for failure to register a machine gun under the National Firearms Act, 26 U.S.C. §§ 5801-5872, and held that, although the statute contained no express "knowledge" requirement, the government was required to prove beyond a reasonable doubt that the defendant knew his weapon fell within the statutory definition of a machine gun, *i.e.*, that he knew that his seemingly conventional semiautomatic rifle had been converted into a fully automatic weapon. *See* 511 U.S. at 602, 114 S. Ct. at 1795. We also note that the statutory definition of a "firearm" under the National Firearms Act is very narrow since the Act mandates registration of only a very limited number of weapons, whereas § 921(a)(3) provides a very broad definition of a firearm, which for all practical purposes excludes only toy guns, models, and replicas. In any event, we need not squarely address whether § 924(c)(1) includes a "knowing" requirement since, assuming it does, there was sufficient evidence from which the jury could reasonably infer that Perkins knew the shotgun was a "firearm" as defined in § 921(a)(3).

[16] Perkins correctly notes that because he failed to object to the jury charge, our review is limited to plain error. *See United States v. Stafford*, 983 F.2d 25, 26 (5th Cir. 1993). "Error in a charge is plain only when, considering the entire charge and evidence presented against the defendant, there is a likelihood of a grave miscarriage of justice." *Id.*

33

808 F.2d 33 (8th Cir. 1986), the Eighth Circuit considered a similar sufficiency challenge in the context of the defendant's conviction under 18 U.S.C. § 1202(a)(1) of being a felon in possession of a firearm. The defendant in *Polk* argued that the government failed to prove that the gun adduced at trial was a "firearm" within the meaning of § 1202(c)(3)—an identical definitional statute to § 921(a)(3)[17]—because there was no evidence that the gun was capable of firing or that it had been test-fired. *See id.* at 34. Rejecting this argument, the Eighth Circuit first emphasized that the statute does not require that "the gun was actually capable of firing," only that it was "designed to" fire. *Id.* Second, the court held that because "the gun was admitted into evidence in plain view of the jury . . . the jury could properly assess whether the gun could fire or was designed to fire." *Id.* Finally, the court held that the jury could infer that the defendant knew the gun was capable of firing based on his postarrest statement to the effect that he was armed because he feared for his life. *See id.*

In *United States v. Munoz*, 15 F.3d 395 (5th Cir. 1994), in the context of a felon in possession conviction under 18 U.S.C. § 922(g), which also incorporates the § 921(a)(3) "firearm" definition, this Court also squarely rejected a sufficiency challenge similar to that raised by Perkins. There, citing *Polk* with approval, we held that the following evidence was sufficient to establish that the weapon at issue was a "firearm."

> The government's witness testified that he purchased and received a "shotgun" from Munoz and that Munoz then informed him that it worked; the shotgun itself was identified by the witness and introduced in evidence; and the prosecution and defense stipulated before the jury that "the firearm alleged in the indictment was in and affecting interstate commerce"; there was no evidence that the shotgun was not designed to (or would not or could not readily be converted to) expel a projectile by the action of an explosive.

*Id.* at 396.

As in *Polk* and *Munoz*, the evidence here was sufficient to support Perkins conviction on count twenty-two. First, the government was not required to present evidence that the shotgun

---

[17] As set forth in *Polk*, section 1202(c)(3) also defined a "firearm" to mean "any weapon . . . which will or is designed to or may be readily converted to expel a projectile by the action of an explosive." *Polk*, 808 F.2d at 34 (quoting 18 U.S.C. app. § 1202(c)(3)).

was test-fired since the gun need not be operational so long as it was *designed to* fire as intended. *See United States v. Ruiz*, 986 F.2d 905, 910 (5th Cir. 1993) (holding that the evidence was sufficient to support a finding that an inoperable gun was designed to expel a projectile, and therefore was a firearm).  Second, there was sufficient evidence from which a jury could conclude that the gun was designed to fire since the gun was admitted into evidence in plain view of the jury, two witnesses specifically identified the weapon and testified that it was a "shotgun," Ward observed a shell in the chamber of the weapon, and there was no evidence that the gun did not meet the statutory definition or that it was a toy, replica, or model.  Finally, there was sufficient circumstantial evidence from which the jury could reasonably infer that Perkins knew the weapon was a "firearm" as defined in the statute.  In addition to the above evidence, DEA Special Agent Henry Biddle testified that narcotics dealers frequently use firearms as tools of the trade to protect their money, their drugs, and their persons.  Indeed, Perkins pointed the shotgun at Baker with his finger on the trigger while making a crack cocaine sale.  Finally, because the evidence was sufficient to establish that Perkins knew the shotgun met the statutory criteria, the district court's failure to instruct on this element did not amount to plain error since there is no likelihood that a grave miscarriage of justice occurred.  *See United States v. Stafford*, 983 F.2d 25, 26 (5th Cir. 1993) ("Error in a charge is plain only when, considering the entire charge and evidence presented against the defendant there is a likelihood of a grave miscarriage of justice." (internal quotation marks omitted)).  We affirm Perkins's conviction on count twenty-two.

D.      TWO-LEVEL SENTENCE ENHANCEMENT UNDER USSG § 2D1.1

Melvin Traylor and Robinson challenge the district court's application of a two-level weapons enhancement to their respective base offense levels based on its finding that Datarvus Traylor possessed a weapon during the conspiracy and that the possession of firearms was reasonably foreseeable to the appellants because firearms are tools of the drug dealing trade.  This finding stems from the March 6 search of Datarvus's home in which agents discovered two 9-mm. weapons—one on the floor next to the bed where Datarvus lay sleeping and one in the closet.

35

Melvin argues that the enhancement was improper because there was no evidence that he was at the house when the weapons were present or that the weapons were used, displayed, or present during any drug transaction. Robinson argues that the enhancement was improper in his case because the evidence did not establish that (1) Datarvus possessed either of the weapons in question, (2) alternatively, that Datarvus possessed a weapon during or in relation to a drug-related offense, and (3) that such possession was foreseeable to Robinson.

With respect to drug offenses, USSG § 2D1.1(b)(1) permits a two-level increase in the defendant's offense level "[i]f a dangerous weapon (including a firearm) was possessed." USSG § 2D1.1(b)(1). The district court's decision to apply the two-level enhancement in a particular case is a factual finding, which we review for clear error. *See United States v. Caicedo*, 103 F.3d 410, 411 (5th Cir. 1997). "A finding of fact is clearly erroneous when, although there is enough evidence to support it, the reviewing court is left with a firm and definite conviction that a mistake has been committed." *United States v. Bermea*, 30 F.3d 1539, 1575 (5th Cir. 1994). As we explained in *Caicedo*:

> This adjustment should be applied "if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." USSG § 2D1.1, comment (n.3). Weapon possession is established if the government proves by a preponderance of the evidence that a temporal and spatial relationship existed between the weapon, the drug trafficking activity, and the defendant. The government must provide evidence that the weapon was found in the same location where drugs or drug paraphernalia are stored or where part of the transaction occurred.

103 F.3d at 412 (citations omitted). If a co-conspirator possessed a dangerous weapon during the course of the conspiracy, the enhancement also applies to the defendant if the co-conspirator's possession was reasonably foreseeable. *See United States v. Gaytan*, 74 F.3d 545, 559 (5th Cir. 1996). "A court may ordinarily infer that a defendant should have foreseen a co-defendant's possession of a dangerous weapon, such as a firearm, if the government demonstrates that another participant knowingly possessed a weapon while he and the defendant committed the offense." *Id.* (internal quotation marks omitted). "Ordinarily one co-conspirator's use of a firearm will be foreseeable because firearms are 'tools of the trade' in drug conspiracies." *United States v.*

36

*Mergerson*, 4 F.3d 337, 350 (5th Cir. 1993).

The district did not clearly err in finding by a preponderance of the evidence that Datarvus Traylor possessed a weapon in connection with the conspiracy. There was sufficient evidence to establish "a temporal and spatial relationship . . . between the weapon, the drug trafficking activity, and [Datarvus]." *Mergerson*, 4 F.3d at 350. Here, the 9-mm. pistols were found in the same room as drug paraphernalia—the electronic scale, the security wand, and the police frequency scanner. A substantial quantity of crack cocaine (27.4 grams) and over $3,000 in cash was also discovered at the residence. The pistol found next to the bed where Datarvus was sleeping was readily accessible to him and available to protect his cash and drug cache. *See United States v. Ramos*, 71 F.3d 1150, 1157 n.25 (5th Cir. 1995) (stating that "[i]n determining possession what matters is not ownership but accessibility" (internal quotation marks and citation omitted)). Additionally, appellants point to no evidence that it was "clearly improbable" that the weapons were connected with the drug conspiracy. *See* USSG § 2D1.1 cmt. 3. Finally, contrary to Robinson's assertion, the government need not establish that the gun was possessed during the course of a particular drug transaction. *See United States v. Eastland*, 989 F.2d 760, 769 (5th Cir. 1993) (holding that § 2D1.1(b)(1) does not require possession during the offense of conviction and stating that the court can consider related relevant conduct). Hence, the evidence was sufficient to establish Datarvus's possession of a dangerous weapon for purposes of the enhancement.

Nor did the district court clearly err in finding that Datarvus's possession of the weapon was reasonably foreseeable to Melvin and Robinson. As this court has repeatedly recognized, firearms are "tools of the trade" in drug conspiracies. *See United States v. Ramos*, 71 F.3d 1150, 1157-58 n.25 (5th Cir. 1995) (citing *United States v. Martinez*, 808 F.2d 1050, 1057 (5th Cir. 1987)); *Mergerson*, 4 F.3d at 350; *Aguilera-Zapata*, 901 F.2d 1209, 1215 (5th Cir. 1990). Melvin and Robinson were both deeply involved in the drug trafficking conspiracy. Also, contrary to Melvin's suggestion, the government was not required to present any evidence that he

37

was ever present at the location where the weapons were found; the only requirement is that the co-conspirator's possession was reasonably foreseeable. *See Gaytan*, 74 F.3d at 559. Here, a preponderance of the evidence established that Datarvus knowingly possessed a weapon during the conspiracy and during his possession of an amount of cocaine sufficient to evidence an intent to distribute. Therefore, the district court did not clearly err in finding that possession of the weapon was reasonably foreseeable to the appellants. *See United States v. Thomas*, 120 F.3d 564, 574 (5th Cir. 1997) (holding that sentencing court did not err in finding that it was reasonably foreseeable to defendants that their co-defendant would have possession of a dangerous weapon where the defendants were jointly engaged in the crime of possession with intent to distribute a very large amount of cocaine), *cert. denied*, 118 S. Ct. 721 (1998).

## III. CONCLUSION

For the foregoing reasons, we affirm the convictions and sentences of Melvin Traylor, Datarvus Traylor, Rodney Traylor, and Fredrick Robinson. As for Jamie Perkins, we vacate his conviction and sentence on the conspiracy and affirm his convictions and sentences on all other counts. That case is remanded to the district court for modification of the special assessment and supervised release in the judgment.

AFFIRMED except for the conspiracy conviction of Jamie Perkins. REMANDED as to Perkins.